UNITED STATES of America, Appellee,

v.

Joseph CAPONE, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Richard MURNANE, Defendant, Appellant.

Nos. 81–1507, 81–1775.

United States Court of Appeals, First Circuit.

Argued April 6, 1982.

Decided July 22, 1982.

Christopher Cabot, Boston, Mass., by appointment of the Court, with whom Herrick & Smith, Boston, Mass., was on brief, for appellant Joseph Capone.

Mitchell Benjoya, Boston, Mass., by appointment of the Court, with whom Denner & Benjoya, Boston, Mass., was on brief, for appellant Richard Murnane.

Paul F. Healy, Jr., Asst. U. S. Atty., Boston, Mass., with whom William F. Weld, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

The appellants, Joseph Capone and Richard Murnane, were convicted by a jury of robbing the mail, assault, and conspiracy to do both. 18 U.S.C. §§ 371, 2 & 2114. Murnane was also convicted of possessing an unregistered sawed-off shot gun. 18 U.S.C. § 2; 26 U.S.C. § 5861(d). The appellants make several arguments attacking their convictions. We conclude that these arguments do not warrant reversals.

The main evidence at trial was provided by John Grider, an admitted accomplice in the crime, who was serving time in jail on a second-degree murder conviction arising out of unrelated activities. Grider was evidently persuaded to testify in this prosecution by a series of promises: he was promised "use" immunity; he was promised a letter from the prosecutor detailing his cooperation, for use when Grider became eligible for parole in six years; and he was promised that, should his life be endangered as a result of having testified, the Government would consider a transfer to another prison.

At trial, Grider described in detail the planning and execution of the robbery. According to Grider, the robbery was planned during a series of meetings in Somerville, Massachusetts, between the appellants, James Hackett, Peter Hackett, and himself. At these meetings, Capone provided information about the schedules of mail trucks and their contents, which he had obtained from his uncle, Joseph Bimber, who worked at the South Postal Annex in Boston. Capone also agreed to supply the guns for the robbery, and he reserved for his uncle and himself one-fifth of the expected profits. According to Grider, although Capone took part in the planning of the robbery, he did not take part in the robbery itself.

Murnane, again according to Grider, did take an active part in the actual robbery. On the day of the robbery, June 16, 1975, Murnane drove the Hackett brothers and Grider in a stolen car to the South Postal Annex. While Murnane (with Peter Hackett) blocked the path of a mail truck attempting to leave the Annex by an access ramp, Grider and James Hackett approached the truck with drawn guns. James Hackett climbed into the cab of the truck, Grider returned to the stolen car, and Murnane led the hijacked mail truck up Route 93.

As other testimony made clear, witnesses alerted the police, and two policemen, Officers Owen and Powers, pursued the hijacked mail truck. A gun battle ensued, in which Officer Owen, demonstrating considerable courage, was seriously wounded. All four attackers escaped on foot and could not immediately be located. Subsequently, four guns were recovered in or near the stolen car, which Murnane had driven.

Grider's testimony was corroborated most significantly by the testimony of Larry Williams, Capone's brother-in-law and a former police officer, who, before the robbery, had discovered a cache of guns in Capone's sister's barn, copied down the serial numbers, and relayed them to the police. The serial numbers given by Williams matched the guns recovered from the stolen car and another gun, a Walther PPK, which Grider admitted to using during this robbery and keeping afterward. Williams also testified

that a trenchcoat, similar to one that Capone wore was stored in the barn with the guns. Officer Owen testified that the attacker who rode in the cab of the mail truck (James Hackett) wore a trenchcoat and the driver of the hijacked mail truck described this same man as having a "barnyard smell." The prosecution also entered into evidence several spent cartridges, discovered during a search of Murnane's bedroom. Tests proved that these cartridges had been fired from the same Walther PPK that Williams had seen in Capone's sister's barn, that Grider said he used during the mail truck robbery, and that Grider later abandoned during another robbery. Other witnesses corroborated several other details of Grider's story, but they could not name the persons involved or provide a detailed description of the events. Thus, only Grider's testimony (while corroborated) absolutely identified the appellants as active participants in this particular robbery.

With this background in mind, we turn to the appellants' claims.

■ 1. Appellants' most significant argument arises out of the prosecutor's remarks to the jury. In his rebuttal argument, the prosecutor made the following comments:

> [C]ounsel [for defendants] suggest[ ] that when the government went out [to Grider's prison to persuade him to testify], they sent their representatives, they've shaped the testimony of Mr. Grider as he testified.
>     . . . . They failed to point out to you that when they went out, Officer Owen, seated in the courtroom was there. The same man that six years ago today lay on the ground wounded. He's the man who went out there, and he talked to Grider, and they suggested his testimony had been shaped by the government.

A few minutes later, in closing his remarks, the prosecutor stated:

> [T]he government would submit to you that it has proven its case beyond any reasonable doubt, all reasonable doubt, that six years ago today Officer Owen la, there in the street wounded, and he sits

before you today awaiting the truth, awaiting your verdict.

Appellants' counsel immediately moved for a mistrial on the grounds that these remarks were an inflammatory appeal to the jury's passions. *Viereck v. United States*, 318 U.S. 236, 237, 247–48, 63 S.Ct. 561, 562, 566–567, 87 L.Ed. 734 (1943); *Berger v. United States*, 295 U.S. 78, 88–89, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). The trial judge denied the motion, but instructed the jury to disregard the remarks. Appellants claim that it was error to deny the motion for mistrial, that the judge's instructions could not cure the harm done by the prosecutor, and that appellants' resulting convictions thus violated their right to due process of law.

We agree with the trial court that this last remark of the prosecutor was improper. We have held that prosecutors must avoid such comments given the "invisible cloak of credibility" that they wear "in virtue of their position," *Patriarca v. United States*, 402 F.2d 314, 321 (1st Cir. 1968), *cert. denied*, 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969). As the Supreme Court has pointed out,

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . . It is as much his duty to refrain from improper methods calculated to produce a conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. at 88, 55 S.Ct. at 633. *See Viereck v. United States*, 318 U.S. at 247–48, 63 S.Ct. at 566, 567; *United States v. Modica*, 663 F.2d 1173, 1180 (2d Cir. 1981).

The issue here, however, is whether it was necessary to retry the case or whether a cautionary instruction was adequate. To require a new trial, we must conclude either that, despite the instruction, the misconduct

was likely to have affected the trial's outcome, *compare United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239, 242–43, 60 S.Ct. 811, 851, 853, 84 L.Ed. 1129 (1939), *with Berger v. United States*, 295 U.S. at 89, 55 S.Ct. at 633, or that sanction is needed to deter future prosecutorial misconduct. *United States v. Farnkoff*, 535 F.2d 661, 668 n.17 (1st Cir. 1976). Thus, we must examine the context of the improper remarks more closely, looking at the severity of the misconduct, whether it was deliberate or accidental, the likely effect of the curative instruction, and the strength of the evidence against the appellants. *Patriarca v. United States*, 402 F.2d at 321–22. *See also United States v. Leon*, 534 F.2d 667, 669 (6th Cir. 1976). After examining the record with these factors in mind, we conclude that reversal here is not warranted for several reasons.

First, the prosecution's appeal to passion, although improper, was isolated. The quoted remarks were the only instances in the course of the five-day trial in which the prosecutor overstepped the bounds of proper conduct. They were not repeated after warnings by the judge, as in *Berger v. United States, supra*. And, they were "not cumulative evidence of a proceeding dominated by passion and prejudice. . . ." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. at 240, 60 S.Ct. at 852. The limited extent of the remarks makes it less likely "that the minds of the jurors would be so influenced by such incidental statements during this long trial that they would not appraise the evidence objectively and dispassionately." *Id.* at 239, 60 S.Ct. at 852. Moreover, they were made in rebuttal to virulent arguments by the defense, which themselves were laden with innuendo, incendiary comments and misstatements of law. Although "we do not consider that a trespass by the defense gives the prosecution a hunting license exempt from ethical restraints on advocacy," *Patriarca v. United States*, 402 F.2d at 321, we have held that:

> [a] prosecutor [is] entitled to attempt to rehabilitate his witnesses, and when defense counsel makes inflammatory statements, we will allow the prosecutor some

what greater leeway in rebuttal. *See United States v. Medina*, 455 F.2d 209, 210 (1st Cir. 1971) (criticism of Government witnesses may invite zealous rejoinder); *cf. United States v. White*, 486 F.2d 204, 206 (2d Cir. 1973), *cert. denied*, 415 U.S. 980, 94 S.Ct. 1569, 39 L.Ed.2d 876 (1974) (dictum) (intemperate remarks at end of a long and hotly contested trial are harmless error.)

*United States v. Flaherty*, 668 F.2d 566, 598 (1st Cir. 1981). Such circumstances do not make what is improper proper, but they do tend to "neutralize[ ] any harm flowing from the prosecutor's remarks." *Id.* *See also United States v. Socony-Vacuum Oil Co.*, 310 U.S. at 241–42, 60 S.Ct. at 852–853.

Second, the improper appeal to passion seems to have been something less than deliberate. The remarks were not part of a prepared discourse, *compare United States v. Leon*, 534 F.2d at 680–82, nor were they a continuing theme upon which the prosecutor played despite repeated warnings by the court. *Compare United States v. Socony-Vacuum Oil Co.*, 310 U.S. at 237–40, 60 S.Ct. at 850–852; *Berger v. United States*, 295 U.S. at 84–85, 55 S.Ct. at 631–632. In context, they were an exaggerated form of a rational argument. The defense had argued strongly that the "government" had fabricated Grider's testimony and "paid for" it by the grant of immunity. The prosecutor responded to this argument by pointing out that Officer Owen himself had interviewed Grider in prison and obtained his testimony. Why would Owen, the very man wounded, want to see the *wrong* people convicted? He, if anyone, would want to see the *right* people put behind bars. He had no interest in obtaining a conviction for its own sake. The first rebuttal excerpt quoted makes clear that this was the prosecutor's argument. The second excerpt is similar in thrust if one emphasizes the word "truth" in the last line: "he sits before you today awaiting the *truth*. . . ." All of this does not make the remarks proper, for these points could and should have been phrased in a more neutral manner. But this context suggests that the appeal to

passion was less than deliberate, making it inappropriate to reverse these convictions as a "disciplinary sanction."

Third, the trial judge gave a strong, explicit cautionary instruction. He told the jury:

> I am going to vary the usual order of instructions, because I do wish to deal with a matter raised in the last seconds of [the] rebuttal argument; that is, concerning Officer Owen, who is clearly from the testimony that we have a very brave and lucky officer, but his interest is not served and it is not your duty to serve his interest, if it were served, by anything other than a truthful verdict as you see it. The suggestion that one verdict as opposed to another is something that he is waiting for is something that you should disregard. I assume that neither he nor anyone else would want a verdict that reflected anything other than the truth as you see it given the burden of proof which the Constitution and laws of the country put upon the government in criminal cases.

This explicit instruction, addressing the misguided implication directly and sharply, was, we believe, in light of the circumstances sufficient to counteract prejudice that flowed from the prosecutor's statement. *United States v. Farnkoff*, 535 F.2d at 668; *United States v. Rodarte*, 596 F.2d 141, 146 (5th Cir. 1979).

Finally, it is most unlikely that any prejudice that survived the judge's instruction could have affected the outcome of this case. The evidence against the defendants was overwhelming if the jury believed Grider and worthless if it did not. Grider's testimony was detailed and basically consistent. It was substantiated by significant independent corroboration. Flaws or inconsistencies in that testimony to which appellants point (*e.g.*, whether Capone provided two or four guns and whether Capone wore a moustache in May 1975) were minor. The major reasons advanced for disbelieving Grider consisted of Capone's denial of his involvement (Murnane did not testify in his own behalf) and Grider's status as a self-confessed accomplice granted immunity. These reasons were explored in detail and argued vigorously by counsel. Moreover, insofar as the jury was in doubt about Grider's credibility making it more likely that the prejudicial remark affected its verdict, the tendency of the rational argument underlying the remark (as discussed above) to relieve that doubt makes the remark itself somewhat less prejudicial. In sum, the record reveals that the jury's verdict could hardly have been the result of passion inspired by the brief remarks of the prosecutor but rather was based upon lengthy testimony, vigorous argument, and a reasonable belief that Grider was in fact credible. We therefore hold that the brief comments by the prosecutor, although improper, did not substantially prejudice the appellants and did not deprive them of their constitutional right to due process of law.

2. Appellants next complain that the district court did not adequately instruct the jury on the need to scrutinize Grider's testimony with care. Appellants' counsel requested, among others, the following instruction:

> 15. The jury is required to consider with great care and scrutiny the testimony of an unindicted co-conspirator to whom a reward or promise has been offered in return for his testimony.

In going over the proposed instructions with counsel, the court said, "15 is correct," and later added, "I think I'm obliged to say extreme care, or particular care, or special care, and I'll do that." In due course, the trial judge gave two instructions on credibility. One was a general instruction, indicating that the jury should evaluate witness testimony according to their "common sense and knowledge of human behavior," and the second referred specifically to Grider as an accomplice:

> Mr. Grider is an accomplice; that is, by his own admission he participated in the crimes charged. And while the testimony of every witness is to be weighed with great care, the testimony of an accomplice must be considered with particular care.

In considering whether to believe Mr. Grider, you may consider what interest he has in testifying, whether there was any particular reason that he should select these two defendants as the people who were with him on the hijack attempt.

Neither of appellants' counsel objected to this instruction at the time; neither pointed out to the judge that he had not given the specific instruction in the precise words previously requested.

■ Appellants first argue that the judge violated Fed.R.Crim.P. 30 by failing to "inform counsel of its proposed action" on requested instruction 15. The short answer to this argument is that the judge agreed to give the instruction, he did in fact give a substantially similar instruction, and in any case defendants were in no way prevented from making their argument to the jury. *See, e.g., United States v. Jones,* 642 F.2d 909 (5th Cir. 1981); *United States v. Smith,* 629 F.2d 650, 653 (10th Cir.), *cert. denied,* 449 U.S. 994, 101 S.Ct. 532, 66 L.Ed.2d 291 (1980).

■ Appellants next object to the instruction actually given. Because the claimed error was not brought to the attention of the court it may only be attacked now if it was "plain error." Fed.R.Crim.P. 52(b). Appellants claim that the court erred by departing from the words of the requested instruction; that by instructing the jury on a "particular care" standard rather than a "great care and scrutiny" standard, the court erred as a matter of law by reducing the degree of scrutiny required; that the court narrowed the broad issue of Grider's credibility to the narrow issue of his motive for singling out appellants; and by not mentioning the grant of immunity in the instruction, the court led the jury to discount defense arguments seeking to discredit Grider on that basis. Parsing of the language used and study of case law does not bear out these contentions. *See United States v. Hickey,* 596 F.2d 1082, 1091 (1st Cir. 1979) (court's instruction cautioning jury with respect to *informant* testimony held adequate where request was one cautioning jury against *accomplice* testimony); *United States v. Rajewski,* 526 F.2d 149, 161 (7th Cir. 1975), *cert. denied,* 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 833 (1976) (the trial judge has discretion to formulate exact language); *United States v. Santana,* 503 F.2d 710, 716 (2d Cir.), *cert. denied,* 419 U.S. 1053, 95 S.Ct. 632, 42 L.Ed.2d 649 (1974), 420 U.S. 963, 1006, 95 S.Ct. 1352, 1450, 43 L.Ed.2d 439 (1975) ("no talismanic formula has been prescribed as a caution to be given to a jury regarding accomplice testimony"); *United States v. Morgan,* 555 F.2d 238, 243 (9th Cir. 1977) ("[T]here is no significant distinction between a cautionary instruction on the testimony of an accomplice and a cautionary instruction on one granted immunity. In both instances, the jury is instructed that the testimony 'be received with caution and weighed with care.' Consequently, whether we treat the government witnesses as accomplices or as persons granted immunity, or both, is immaterial because the instruction would be the same."); *United States v. Watson,* 623 F.2d 1198, 1205 (7th Cir. 1980) ("we believe that the general instruction on credibility, the instruction on accomplice testimony, and defense counsel's development of the immunity issue in cross-examination and summation adequately alerted the jury to the caution necessary in weighing the testimony of immunized witnesses"). But, in any event, the instruction given most certainly did not amount to *plain* error. *McMillen v. United States,* 386 F.2d 29, 35 (1st Cir. 1967), *cert. denied,* 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1968). Appellants had requested "great care and scrutiny." The judge instructed that every witness's credibility was to be considered with "great care," but that that of Grider was to be considered with "particular care"—in context this was obviously presented as a more exacting standard than "great care." Appellants were required to object in a timely fashion if variation from the words of the request, certainly not obvious on the face of the matter, were significant, and may not rely upon the fact that a request was submitted to discharge their obligations under Fed.R.Crim.P. 52. *Cf. United States v. Lachman,* 469 F.2d 1043

(1st Cir.), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1972).

■ 3. Appellants argue that the Government violated their constitutional rights by delaying their indictment for approximately two and one-half years. *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752, *reh. denied,* 434 U.S. 881, 98 S.Ct. 242, 54 L.Ed.2d 164 (1977). They argue that the Government knew all of the details of the crimes and the substance of Grider's testimony in September 1977; that the Government did not proceed with an indictment because Grider refused to testify without immunity; that the Government did not conduct further investigations after this, but rather simply sat on the case; and that on the eve of the expiration of the statute of limitations, the Government granted immunity to Grider. Appellants claim that this delay prejudiced them because Bimber, Capone's uncle would have testified in their behalf, but he became incapacitated in the intervening years, and they argue that the Government was not justified in delaying the grant of immunity.

■ As the statute of limitations provides the main source of protection from delay in prosecution, it is necessary for appellant to prove *actual prejudice* in order to succeed on a claim that pre-indictment delay that yet resulted in an indictment within the statutory period resulted in a deprivation of due process. *Id.* at 789–90. This is a heavy burden. *See, e.g., United States v. Henry,* 615 F.2d 1223 (9th Cir. 1980); *United States v. Elsbery,* 602 F.2d 1054 (2d Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979). Appellants argue that prejudice in their loss of witness Bimber. Even were we to overlook the impropriety of raising this argument for the first time on appeal (thus depriving us of trial court findings of fact), *see United States v. Sachs,* 679 F.2d 1015 at 1018, 1019 (1st Cir. 1982), the prejudice to appellant seems highly speculative. It is far from certain that Bimber, who was an indicted co-conspirator would have waived his fifth amendment right not to testify. And, it seems arguable that his incapacity was not

the result of the passage of time; but rather resulted from the "shock" of indictment. But, in any event, the Government was justified in not granting Grider immunity in 1975. Since Grider was a major figure in the conspiracy, and since the Government would have wanted to indict him, rather than to grant him immunity, its decision to wait until the last minute to see if any other alternative developed was reasonable. There is no evidence suggesting that the Government deliberately sought delay for purposes of tactical advantage or harassment. *See United States v. Ciampaglia,* 628 F.2d 632, 639 (1st Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1982) (there is no due process violation in the absence of bad faith delay). Hence, we find no due process violation in the delay.

■ 4. Appellants claim, and the Government concedes, that the names of the grand jurors who indicted them were not drawn "publicly" as required by the Jury Selection and Service Act of 1968, 28 U.S.C. § 1866(a), because there was no posted notice of the drawing. A violation of the Act, however, constitutes grounds for reversal only if it amounts to a "substantial failure" to comply with the statute. 28 U.S.C. § 1867(a). The failure to post notice is a "technical," not a "substantial" violation. This matter was recently analyzed with care by the Fifth Circuit in *United States v. Bearden,* 659 F.2d 590 (1981), *cert. denied sub nom. Northside Realty Assoc. v. United States,* —— U.S. ——, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982), and, we accept that analysis.

■ 5. Capone claims that the trial judge should have instructed the jury on the question of his "withdrawal" from the conspiracy. Capone's counsel never requested any such instruction, nor is there any record evidence which would, without highly imaginative argument, suggest a factual basis for that claim. There was thus no error in failing to deliver *sua sponte* a withdrawal instruction.

■ 6. The remaining arguments we find frivolous. Murnane claims that the

court improperly admitted evidence showing that he was engaged in a past crime. But a reading of the record makes it clear that the contested evidence showed that Murnane was *not* involved in the past crime. Capone argues that the verdicts against him were inconsistent. But, they are not necessarily inconsistent, and even if they were, inconsistent verdicts are lawful. *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932).

For these reasons the convictions are *Affirmed.*