UNITED STATES of America, Appellee,

v.

Dorothy COX, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Anthony MARRA, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Mary PERKINS, Defendant, Appellant.

Nos. 84–1173 to 84–1175.

United States Court of Appeals,
First Circuit.

Argued Oct. 5, 1984.

Decided Jan. 16, 1985.

---

Alfred Paul Farese, Everett, Mass., with whom Michael F. Natola, Everett, Mass., was on brief for defendant, appellant Dorothy Cox.

Anthony M. Arena, Boston, Mass., for defendant, appellant Anthony Marra.

Ellen Wade, Boston, Mass., by appointment of the Court, for defendant, appellant Mary Perkins.

Joseph F. Savage, Jr., Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief for appellee.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and WEIGEL,* Senior District Judge.

BREYER, Circuit Judge.

A jury convicted appellants Dorothy Cox, Mary Perkins, and Anthony Marra of possessing cocaine with an intent to distribute it. 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2. It also convicted Cox and Marra of being part of a related conspiracy (which allegedly included Candis White, who was tried separately). 21 U.S.C. § 846. Cox, Perkins, and Marra challenge their convictions on several grounds. We find that none of these grounds warrants reversal, and we affirm the convictions.

A

After reading through the record in this case, we find that the evidence presented at trial, viewed in a light appropriately favorable to the government, *United States v. Patterson*, 644 F.2d 890, 893 (1st Cir.1981), is sufficient to show at least the following:

1. Mike Engle, a government informant, arranged a meeting between Mary Perkins and Drug Enforcement Agency ("DEA") agent John Fencer, at which Perkins was to sell Fencer a half ounce of cocaine. The meeting took place May 12, 1983. Fencer drove to the meeting point in Cambridge. Perkins got into Fencer's car and said they should wait until the cocaine arrived. Fencer and Perkins discussed a possible future purchase of a pound of cocaine, which Perkins said she could arrange for $33,000. Perkins said that her source was a mother and daughter working together, and that the daughter would arrive shortly with the half ounce. A few minutes later Candis White drove up in an AMC Hornet and parked behind Fencer's car. Perkins left Fencer's car, went to White's, and then returned with a half ounce of cocaine. Fencer paid her $1,200 and drove off.

2. On June 22, 1983, Engle spoke to Dorothy Cox, Candis White's mother. He told her that he and a friend (Fencer) had

* Of the Northern District of California, sitting by designation.

been buying from Mary Perkins, and that his friend wanted to deal directly with Cox. Cox and Engle arranged for Fencer to buy one ounce of cocaine from Cox for $2,500 but to keep the purchase a secret from Perkins.

3. Fencer and Engle met Cox at the Meadow Glen Mall parking lot on June 24, 1983. Cox got into Fencer's car. Fencer gave her $2,500. Cox took the money and got into an AMC Hornet where Candis White was waiting. Cox returned to Fencer's car and gave him a package of cocaine. She also gave Engle a small packet of cocaine with the word "present" written on it. Cox quoted Fencer a price of $60,000 for a kilogram of cocaine. She gave him a piece of paper with the phone number of her 'beeper' service on it.

4. On June 30, 1983, Fencer called the 'beeper' number. Cox returned the call. They arranged for purchase of another ounce of cocaine, to take place at Meadow Glen Mall. When Fencer arrived at the Mall, White brought him the cocaine. She said that she and her mother were working hard at the cocaine business. And, she mentioned that her mother was usually more careful about dealing with new customers than she had been with Fencer.

5. On August 31, 1983, Fencer spoke to Cox several times on the phone and arranged to buy one kilogram of cocaine, to be transferred at Meadow Glen Mall later that day. A DEA agent, watching Cox, noticed that she went to Malden Pattern Works, which was Marra's place of business. She spent about 45 minutes there. She then went to her apartment and from there to Meadow Glen Mall.

At the Mall, Cox first showed Fencer a piece of paper on which were written Fencer's undercover phone number and his automobile registration number. Cox said that the phone number had been traced to the John F. Kennedy federal building in Boston and the car registration had been traced to the "We Try Harder Corp." in New York City. Fencer said that Cox's information was wrong. Cox then sold

Fencer the cocaine. And Fencer immediately arrested Cox.

Fencer then went to Cox's and White's apartment where DEA agents had already arrested White. In the apartment the agents found and seized two kilograms of cocaine, two triple beam balance scales with cocaine residue, a substantial amount of drug paraphernalia, a cocaine price list, and a business card for Malden Pattern Works with Marra's name on it. While the agents were searching the apartment, Marra called three times within a thirty-minute period. Each time, he told the DEA agent who answered the phone that he wanted to speak to Cox or White about a matter that he described as "very important." The agent took his name and told him that he would give the message to Cox and White.

Fencer then returned to his office, where he phoned Malden Pattern Works and spoke to Marra. Fencer was aware that Cox had previously told him that she had an associate with facilities for testing cocaine; that she had said she stored two kilograms of cocaine at one place and one kilogram at another place; and that she had stopped at Malden Pattern Works earlier in the day. According to the transcript of this taped conversation, Fencer told Marra that he was just concluding a deal with Cox. Although Marra warned Fencer that "you just gotta be careful what you say on the [telephone]," they proceeded to discuss chemists, tests for purity, the fact that Cox handled all the wrapping of the merchandise, the fact that Marra "gave everything to her," and the fact that Marra had been in the "coke business" for "a little while." While this conversation was in progress, other DEA agents arrived at Malden Pattern Works and arrested Marra. During a subsequent search of Marra's premises, DEA agents found a triple beam balance scale with cocaine residue. They found a piece of paper with Fencer's undercover phone number, his automobile registration number, and the words "We Try Harder Corp.," all written in Marra's handwriting. They found several photographs of Marra and Cox together. Marra told them that he

had been seeing Cox socially for "a number of years."

The government proved these facts (and others) through the testimony of Fencer and other agents, corroboration by DEA surveillance agents, various admissions by the defendants, and nineteen taped telephone conversations. Our examination of the record, containing this evidence, leads us to conclude that the evidence against Marra was sufficient to support his conviction; the evidence against Perkins was at least as strong, if not stronger; and the evidence against Cox was overwhelming.

### B

■ 1. The most important point that appellants raise on this appeal concerns the prosecutor's closing argument at trial. The prosecutor improperly called attention to the failure of some of the defendants to take the stand and testify at trial. The prosecutor told the jury the following:

> Now, as you know, the defendants have no obligation to put on a defense at all.... And you are to draw no inference from that. I'm going to pose some questions to you, ladies and gentlemen of the jury, and they have no obligation to answer them. But I suggest that they're things you can consider when you go in the jury room to evaluate the evidence.
>
> For example, how does Mary Perkins explain knowing that the people are reliable in the past and talking about the future? How does Mary Perkins explain Dorothy Cox's statements on Government Exhibit No. 3, the taped transaction? ... Does Marra's explanation of the telephone conversation make any sense? And how does he explain Dorothy Cox's statements about where she's getting the cocaine from?

Defense counsel immediately objected. The trial judge denied their motion for a mistrial, but he instructed the jury:

> Members of the jury, I will instruct you very firmly that there is no burden on a defendant in a criminal case at any time. And any suggestion that might be interpreted in any way as a suggestion

that any inference should be drawn by you by their failure ... to answer any question posed by the government is an improper argument.

The defendants now argue that the prosecutor's remarks constitute so serious a violation of the basic rule forbidding comment on failure to testify, *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965), that we should order a new trial despite the curative instruction.

■ In deciding whether a new trial is required—either because prosecutorial misconduct likely affected a trial's outcome or to deter such misconduct in the future—we consider "the severity of the misconduct, whether it was deliberate or accidental, the likely effect of the curative instruction, and the strength of the evidence against the appellants." *United States v. Capone,* 683 F.2d 582, 586 (1st Cir.1982); *see also United States v. Maccini,* 721 F.2d 840, 846 (1st Cir.1983). In this case, a balance of these factors indicates that a new trial is not necessary.

We recognize two factors that cut in favor of a new trial. First, the misconduct itself seems a fairly severe violation of the *Griffin* rule. While a jury might take the prosecutor's questions as referring only to the evidence the defense actually presented, it might also have taken them as pointing out that Mary Perkins had failed to explain certain things because she chose not to testify. Second, the prosecutor's remarks were, in a sense, deliberate. The prosecutor's prefatory statement pointing out to the jury that defendants need not present any defense suggests that he saw relevant danger lurking in the questions that followed.

These factors are outweighed, however, by several others. First, in context, there is little risk that the remarks prejudiced defendants' trial. Defendant Marra did not assert his Fifth Amendment privilege. Since he testified on his own behalf, the jury could not have taken the prosecutor's remarks as a comment on his refusal to testify. Although defendant Cox did not

testify, the prosecutor did not mention her failure to testify in the challenged remarks; and, as we said above, the evidence against her was overwhelming. The prosecutor's remarks did refer to Perkins directly and Perkins did not testify. The evidence against Perkins, however, was very strong. Fencer testified in detail about her sale of cocaine to him. Two DEA surveillance agents watched the transaction from nearby and provided important corroborating testimony. In light of this evidence, the improper remarks were of little, if any, significance.

Second, the prosecutor's remarks appear to be an isolated instance of misconduct, see United States v. Capone, 683 F.2d at 586. We have examined the two other instances of allegedly improper prosecutorial conduct that defendant Cox cites. At one point in the trial, the prosecutor asked a government chemist, "Were any of the prints of any of the defendants detected?"; at another point, he referred to Cox's "personal history sheet" and an "FBI sheet." Cox says that the jury might have inferred from these references that she had a prior arrest or conviction record. We see no reason, however, why the jury would not more naturally have believed that the remarks referred to fingerprints or FBI records made after Cox's arrest for the crimes here at issue. The two remarks by the prosecutor were harmless, and all the alleged instances of impropriety, even when taken together, show no significant pattern of prosecutorial misconduct in the course of this twenty-four day trial.

Third, the judge's cautionary instruction was immediate, definitive, and strong.

In light of these factors, we conclude that the prejudice, if any, does not require a new trial. See United States v. Hasting, 461 U.S. 499, 510–11, 103 S.Ct. 1974, 1981–82, 76 L.Ed.2d 96 (1983) (upholding conviction where prosecutor's improper remarks constituted harmless error); United States v. Maccini, 721 F.2d at 847 (no reversible error where prosecutor's improper remarks "could not reasonably have affected the outcome of the trial"). And, the offense was not so egregious as to warrant reversing the convictions as a "disciplinary sanction." Compare United States v. Williams, 496 F.2d 378, 384 & n. 7 (1st Cir. 1974), and United States v. Farnkoff, 535 F.2d 661, 668 & n. 17 (1st Cir.1976), with United States v. Capone, 683 F.2d at 586–87.

◼ 2. Marra argues that the district court should have severed his trial from that of Cox and Perkins under Fed.R. Crim.P. 14, which allows a severance "[i]f it appears that a defendant ... is prejudiced by a joinder ... of defendants." Severance is warranted only upon a "strong showing of prejudice," United States v. Bautista, 731 F.2d 97, 100 (1st Cir.1984) (quoting United States v. Lochan, 674 F.2d 960, 967 (1st Cir.1982)), a matter primarily for the trial court to determine. United States v. Bautista, 731 F.2d at 99–100. The trial court did not exceed its lawful powers in finding no such showing here.

Marra presented affidavits from his co-defendants stating that they would testify on his behalf were they to be tried first. Neither Marra nor the codefendants stated specifically, however, what the codefendants would say or how their testimony would exculpate him. Yet, some such showing is necessary to gain severance. United States v. Drougas, 748 F.2d 8, 19 (1st Cir.1984); United States v. Smolar, 557 F.2d 13, 21 (1st Cir.), cert. denied, 434 U.S. 971, 98 S.Ct. 523, 54 L.Ed. 2d 461 (1977); United States v. Butler, 611 F.2d 1066, 1071 (5th Cir.), cert. denied, 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980). Marra argues that the codefendants might have feared to be more specific, lest such specific information be used against them. But, Marra did not ask the district court to consider ways around this dilemma, such as a codefendant's offer to waive Fifth Amendment rights after his trial is concluded. See, e.g., United States v. DePalma, 466 F.Supp. 920, 922–23 (S.D. N.Y.1979) (holding that movant may make offer of codefendant's testimony conditional upon codefendant's being tried first). Marra's failure in this regard is particular-

ly noteworthy because the trial judge suggested that he might reconsider the severance motion if such a waiver offer were before him.

Marra also claims that the mountain of evidence against his codefendants might have prejudiced the jury against him. Yet, there was considerable, and related, evidence against him as well. And, the judge gave an appropriate limiting instruction, impressing upon the jury its duty to consider the guilt of each defendant individually. *United States v. Smolar,* 557 F.2d at 21. Nothing in the record before us takes this case outside the scope of the ordinary rule, embodied in Fed.R.Crim.P. 8(a), which permits joint trial of defendants who "are alleged to have participated ... in the same series of acts or transactions constituting an offense."

■ 3. Marra challenges the district court's denial of his motion to suppress physical evidence seized, and statements he made, when DEA agents arrested him. The DEA agents testified that Marra consented to (indeed, insisted upon) the search of his office and adjacent living quarters where they found the physical evidence. They add that Marra made incriminating statements following his arrest only after they read him a statement of his *Miranda* rights. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Marra claims here, as he did below, that he did not consent to a search and that he did not make a knowing and voluntary waiver of his right to silence; hence, admission of the evidence violates the Fourth and Fifth Amendments. *See Miranda v. Arizona,* 384 U.S. at 475, 86 S.Ct. at 1628; *Schneckloth v. Bustamonte,* 412 U.S. 218, 223–49, 93 S.Ct. 2041, 2045–59, 36 L.Ed.2d 854 (1973). The basic question before the district court, however, was one of fact, not of law. The district court listened to testimony about what happened at the time of Marra's arrest. It simply found the DEA agents' account more credible than Marra's.

■ Marra's counsel seeks to cast doubt on that account by asking why Marra

would have allowed a search that would likely lead to seizure of incriminating evidence. This question is not sufficient, on appeal, however, to render the DEA's story incredible. Nor, as the district court found, does the fact that the DEA agents may have had their hands on their holsters automatically show that Marra's will was "overborne." *Schneckloth v. Bustamonte,* 412 U.S. at 225, 93 S.Ct. at 2046–47 (quoting *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961) (opinion of Frankfurter, J.)). Matters of credibility and determinations of fact are for the district court. *See United States v. Kimball,* 741 F.2d 471, 474 (1st Cir.1984). And, nothing in the record removes this case from that ordinary rule.

■ 4. Cox challenges the government's decision to bring her to trial by way of grand jury indictment rather than by way of preliminary "probable cause" hearing. She concedes that federal law specifically gives the prosecutor the choice of which of these two pretrial procedures to use. 18 U.S.C. § 3060. But, she notes that the preliminary hearing gives a potential defendant greater advantage, for it is an adversary, rather than ex parte, proceeding. And, she points to a recent Oregon case requiring state prosecutors to use uniform, articulable standards in choosing between the two analogous state law procedures, and forbidding them from using certain impermissible criteria, such as race or nationality. *State v. Freeland,* 295 Or. 367, 667 P.2d 509 (1983) (en banc). We need not investigate this novel argument here, however, for nothing in the record suggests that the prosecutor used any such impermissible standards. Nor need we remand for an evidentiary hearing about what standards were used. Cox did not seek such a hearing in the district court, and therefore the issue is not properly before us. *Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 894 (1st Cir.1979).

5. Cox argues that she and her codefendants should have been allowed more than the ten peremptory challenges that Fed.R.Crim.P. 24(b) provides defendants in

noncapital cases. She correctly points out that when there are several defendants, "the court may allow the defendants additional peremptory challenges." But this language *permits*—it does not *require*—the court to do so. *See* Advisory Committee Note to Rule 24.

■ The district court's authority in applying this rule is broad. *See United States v. Williams,* 447 F.2d 894, 896–97 (5th Cir.1971); *Gradsky v. United States,* 342 F.2d 147, 152–53 (5th Cir.1965) (holding that it was not an abuse of discretion to limit ten codefendants to ten peremptory challenges), *vacated on other grounds sub nom. Levine v. United States,* 383 U.S. 265, 86 S.Ct. 925, 15 L.Ed.2d 737 (1966). The court here found no "suggestion of any basis ... [or] any reason that this case is distinctive and [that the codefendants] should not be able to cooperate in the exercise of ten challenges." This finding is adequately supported. By itself, the fact that the defendants were of different sexes—a fact upon which Cox relied in making her peremptory challenge argument to the trial judge—shows no inherent conflict that providing additional peremptory challenges to the group of them could cure.

■ 6. Cox claims that she was unfairly surprised and prejudiced when the government called DEA agent Parham to identify Cox as the person that he saw getting into Fencer's car at the time of a cocaine sale at Meadow Glen Mall. The government called Parham because Morelli, another DEA surveillance agent, was unable specifically to identify Cox in court as the female figure that she saw getting into Fencer's car. The government had provided Cox before trial with a witness list that contained Morelli's name but not Parham's.

Cox, however, was aware of Parham's existence, for the government had also provided Cox with a DEA report that details both Parham's and Morelli's participation in the surveillance. Moreover, when the trial court decided to allow the government to call Parham, it informed Cox of this decision and gave her five days to prepare for Parham's testimony. There is nothing here to suggest that the amount of time was inadequate, to indicate that Cox was prejudiced by the government's failure to include Parham's name on the initial witness list, or to warrant our setting aside this exercise of a trial court's broad powers to control the presentation of evidence. *See* Fed.R.Evid. 611(a) (giving district court authority to supervise "the mode and order of interrogating witnesses and presenting evidence"); *cf.* J. Cotchett & A. Elkind, *Federal Courtroom Evidence* 94 (1984 ed.) ("Matters such as ... recalling a witness, or accepting rebuttal testimony are particularly within the province of the trial judge who has wide latitude in his decisions.").

■ 7. Cox points to two instances in which witness sequestration procedures (apparently ordered by the district court) were violated and argues that the trial court should therefore have stricken the offending witnesses' testimony or ordered a new trial. In one instance, a DEA agent talked to another agent about the position of a particular car. In the other, one witness sat just outside the courtroom for ten minutes while another witness testified. In each instance, the trial court allowed defense counsel to question the witness about the alleged violation; and it instructed the jury to take any such violation, if one was found, into account in assessing credibility. The appropriate sanction for breach of a sequestration order is ordinarily left to the district court. *See United States v. Arruda,* 715 F.2d 671, 684 (1st Cir.1983); *United States v. Ayres,* 725 F.2d 806, 811–12 (1st Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984). Cox does not show that the measures adopted here by the district court were inappropriate or that the violations were so important as to place them outside this ordinary rule.

■ 8. Appellant Perkins argues that the district court improperly admitted against her statements made by her alleged coconspirator, Cox. The challenged statements were made in a taped phone conversation between Cox and Engle during which Engle indicated that he had a

friend who had bought drugs from Perkins but that his friend would prefer to deal with Cox. The district court admitted the statements under the coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E), after finding by a preponderance of the evidence that there existed, at the time the statements were made, a conspiracy between Cox and Perkins to sell and to distribute cocaine. *See United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977).

We need not consider Perkins' various claims of error in this regard, however, for the jury acquitted Perkins of the conspiracy charge, the charge to which this evidence seemed most relevant. Given the strength of all the other evidence against Perkins on the charge of distributing cocaine—the direct eyewitness testimony— any error in admitting the taped conversation was harmless. *Cf. United States v. Indelicato*, 611 F.2d 376, 383–84 (1st Cir. 1979).

The appellants' remaining arguments are without merit. For the reasons stated, the judgments of conviction are

*Affirmed.*