March 2, 1993
[NOT FOR PUBLICATION]

United States Court of Appeals
For the First Circuit

No. 92-2123

UNITED STATES,

Appellee,

v.

BARRY L. WEINSTEIN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Torruella, Circuit Judge,

Campbell, Senior Circuit Judge,

and Stahl, Circuit Judge.

Joseph J. Balliro with whom Balliro, Mondano & Balliro was on

brief for appellant.
Despena Fillios Billings, Assistant United States Attorney, with

whom A. John Pappalardo, United States Attorney, was on brief for

appellee.

STAHL, Circuit Judge. In this appeal, defendant

Barry L. Weinstein challenges his conviction for knowing

receipt of stolen property, and for conspiracy to commit that

crime. Specifically, defendant argues that his trial was

unfairly prejudiced by certain comments made by the

government in its closing argument, and by the district

court's charge to the jury. Finding the government's

comments to be harmless error, and the jury instructions

proper, we affirm.

I.

FACTUAL BACKGROUND

The government's evidence in this case shows that

in February of 1991, Michael Flatt, accompanied by a friend,

broke into a safe in a private home in Dallas, Texas, and

stole approximately 26 items of jewelry. The purloined items

had a total resale value between $85,000 and $134,000. Flatt

packaged the pieces and sent them via Federal Express to his

home in Boston, Massachusetts. Upon his return to Boston,

Flatt sought to have some of the jewelry appraised. He took

three examples of the loot to "Roy K. Eyges, Inc.," a jewelry

store in Boston, where he was introduced to defendant, a

jewelry appraiser employed at the store.

Flatt told defendant that he had inherited the

jewelry and that he was interested in selling it. In the

privacy of defendant's office, defendant indicated that he

-2-
2

was interested in helping Flatt sell the jewelry, but that he

wanted to do so independently of his employer, so that he

could obtain a commission on the sale. At this first

meeting, defendant suggested that he and Flatt transact their

business in cash.

The following weekend, defendant met with Flatt,

and was given several pieces of the jewelry to sell. Some

days later, by arrangement, the two met in a public parking

garage, where defendant gave Flatt a paper bag containing

between $7,000 and $9,000 in cash obtained from the sale of

unspecified pieces of the stolen jewelry.

At this meeting, defendant asked about the source

of the jewelry. Flatt advised defendant that he had stolen

the jewelry from Texas. Defendant said that he had suspected

that the jewelry was stolen. He also told Flatt that he had

checked to see if the jewelry had been reported stolen, and

that it had not been so reported.

Several days later, again by arrangement, defendant

and Flatt met in defendant's car on a designated street in

Boston. Defendant informed Flatt that defendant and a

partner, co-defendant Eric Bleiler,1 were attempting to

raise money in order to purchase some of the pieces outright

from Flatt. At that meeting, Flatt gave defendant

1. At trial, Bleiler was acquitted of all charges against
him.

-3-
3

approximately ten additional pieces of stolen jewelry to

sell.

In the course of subsequent phone conversations,

defendant told Flatt that his partner Bleiler had more cash

for Flatt from the sale of some of the jewelry, and that

defendant could pick up the cash at Bleiler's shop in Newton,

Massachusetts, outside of Boston. Flatt went to Bleiler's

shop and was given a paper bag containing approximately

$9,000 in cash.

Shortly after his visit to Bleiler's shop, Flatt

left Boston to live in San Francisco. Defendant notified

Flatt by phone that he was interested in doing additional

business with Flatt, and that he had $15,000 more in cash for

Flatt from the sale of additional pieces of the stolen

jewelry. Flatt requested that defendant send him the cash in

San Francisco via Federal Express. Before receiving these

last proceeds from the sale of the purloined jewelry, Flatt

was arrested in San Francisco in connection with the Dallas

burglary.2 After his arrest, Flatt signed a written consent

form allowing the San Francisco Police Department to open his

mail. On April 24, 1991, the San Francisco Police

intercepted and opened a package addressed to Flatt from

defendant which contained $15,100 in cash.

2. In separate proceedings, Flatt was convicted on state
charges of burglary and on federal charges of interstate
transportation of stolen property.

-4-
4

Shortly thereafter, defendant was arrested and

charged with one count of knowing receipt of stolen property

in violation of 18 U.S.C. 2315,3 and one count of

conspiracy to commit that crime in violation of 18 U.S.C.

371.4 After a five-day jury trial, defendant was convicted

on both counts. From these convictions, defendant now

appeals.

II.

DISCUSSION

On appeal, defendant argues that certain of the

government's comments during closing argument were unfairly

prejudicial. Defendant also challenges one of the court's

instructions to the jury. We address each argument in turn.

3. 18 U.S.C. 2315 states in relevant part:

Whoever receives, possesses, conceals, stores,
barters, sells, or disposes of any goods, wares, or
merchandise, securities, or money of the value of
$5,000 or more . . . which have crossed a State or
United States boundary after being stolen,
unlawfully converted, or taken, knowing the same to
have been stolen, unlawfully converted, or taken .
. . [s]hall be fined not more than $10,000 or
imprisoned not more than ten years, or both.

4. 18 U.S.C. 371 states in relevant part:

If two or more persons conspire . . . to commit any
offense against the United States . . . and one or
more of such persons do any act to effect the
object of the conspiracy, each shall be fined not
more than $10,000 or imprisoned not more than five
years, or both.

-5-
5

A. Government's Comments During Closing Argument

The following colloquy took place during the

government's closing argument:

Government: [Defendants] are not, as
[defense counsel] argued to you in his
opening, sitting the[re] clothed in a
mant[le] of innocence and I am asking you
--

The Court: Oh, yes, they are.

Defendant's counsel: Objection.

Co-defendant's counsel: Objection.

The Court: They are indeed clothed in a
mant[le] of innocence. They stand before
you now -- sit before you now absolutely
and totally innocent. They remain
innocent until the government proves them
guilty beyond a reasonable doubt.

Defendant argues that the government's statement had the

effect of denying him the presumption of innocence, and that

the comment was sufficiently prejudicial to warrant a new

trial. We disagree.

The prejudicial statements of a prosecutor at trial

are subject to a harmless error analysis. United States v.

Hasting, 461 U.S. 499, 507-509 (1983); United States v.

Brown, 938 F.2d 1482, 1489 (1st Cir.), cert. denied, 112 S.

Ct. 611 (1991). Convictions will therefore not be set aside

"for small errors or defects that have little, if any,

likelihood of having changed the result of the trial.'"

Hasting, 461 U.S. at 508 (quoting Chapman v. California, 386

U.S. 18, 22 (1967)).

-6-
6

In determining whether prosecutorial misconduct

rises above the level of harmless error, "`we consider the

severity of the misconduct, whether it was deliberate or

accidental, the likely effect of the curative instruction,

and the strength of the evidence against appellant[].'"

Brown, 938 F.2d at 1489 (quoting United States v. Cox, 752

F.2d 741, 745 (1st Cir. 1985)).

Having carefully considered all of the factors set

forth in Brown, it is our opinion that the likely effect of

the district court's strong, correct and contemporaneous

curative instruction, when combined with the court's final

charge,5 was that the jury remained properly apprised of the

presumption of innocence, despite the government's

improvident statement. Accordingly, we rule that the

prosecutor's comment, although improper, was harmless error.

See, e.g., United States v. Lilly, No. 91-2192, slip op. at

5. Along with its sua sponte correction, which literally cut

off the government in mid-sentence, the district court also
gave the following instruction in its final charge to the
jury:
Now, we have talked a lot about the
presumption of innocence. It is a rule
of law in this country, indeed, it is a
constitutional rule, that a defendant is
presumed to be innocent. And that means,
very simply that the defendant is
innocent. He is innocent until the
government proves him guilty. And
because he is innocent, he does not have
to prove his innocence. He has no
obligation to offer any evidence, he has
no obligation to offer any explanation,
hehas no obligation to take the stand.

-7-
7

17 (1st Cir. 1992) (indicating that generally "a strong

message from the bench, delivered promptly, is a satisfactory

antidote to the potentially poisonous effects of an ambiguous

comment or a remark that sails too close to the wind");

United States v. Maccini, 721 F.2d 840, 847 (1st Cir. 1983)

(holding that district court's "strong curative instructions

were sufficient to correct" the effect of government's

improper statements).6

6. Defendant also challenges two implications allegedly made
by the government during its rebuttal to defendant's closing
argument. According to defendant, the government unfairly
implied that the testimony of law enforcement officials is
generally more credible than the testimony of laypersons, and
that defendant's actions had violated a Boston ordinance
which requires that large cash transactions be reported to
the Boston Police.
Even if the government's comments carried these
implications, defendant has failed to argue, let alone
demonstrate, that either comment "`changed the result of the
trial.'" Hasting, 461 U.S. at 508 (quoting Chapman, 386 U.S.

at 22). As defendant himself concedes, the government's case
against him consisted primarily of Flatt's testimony.
Neither police credibility nor the Boston ordinance were
significant issues in the case against defendant.
Moreover, the district court directly addressed
defendant's concerns regarding the statements. With regard
to the testimony of law enforcement officers, the district
court told the jury: "You should judge [law enforcement
officials] in exactly the same way as you judge everybody
else. Just because they work for a law enforcement agency,
doesn't make them more believable nor less believable than
anybody else." With regard to the Boston ordinance, the
district court instructed the jury that "neither [defendant]
nor [co-defendant] Bleiler do business in Boston. So, there
is no evidence one way or the other that they have any
obligation to file a police report." We find these
instructions more than adequate to dispel any possible
prejudice from the government's statements. See, e.g.,

Lilly, slip op. at 17 (strong corrective instructions

generally sufficient to cure improper prosecutorial
comments). To the extent, therefore, that these statements

-8-
8

B. Jury Instructions

Defendant also challenges the following jury

instruction regarding the process of evaluating witness

credibility:

Now, th[e] process [of evaluating witness
credibility] is, as used here, no
different from what you do all the time,
every day in your lives. When somebody
tells you a story, you make a judgment
whether you believe what the person told
you. You probably do it almost
instinctively. And I ask you to make the
same judgment, precisely the same kind of
judgment, as you review the testimony of
each of the witnesses.

Relying on United States v. Araujo, 539 F.2d 287, 290-91 (2d

Cir.), cert. denied, 429 U.S. 983 (1976)), defendant argues

that this instruction was prejudicial because it permitted

jurors to rely improperly on their "instincts" rather than

their common sense in assessing witness credibility. We find

defendant's argument bordering on the frivolous.

The district court in Araujo, referring to

particular testimony or evidence at trial, instructed the

jury that human beings have a tendency or a "natural

were improper, they too were harmless error.
Similarly, we are unpersuaded by defendant's argument
that the two comments had the cumulative effect of rendering
the trial unfair. Given that the comments were unrelated to
each other, and that each comment standing alone was at most
harmless error, there simply is no basis for concluding that
the comments taken together influenced the outcome of
defendant's trial in any way.

-9-
9

instinct" to lie when confronted with an accusation. The

Second Circuit disapproved of the comment, stating that "it

would be preferable if the trial judge avoided interjecting

his[/her] own personal views of human nature into the

charge." Id. at 291.

Plainly, the instant case is very different from

Araujo. In using the term "instinctively" in the instant

case, the district court, in the context of a complete and

correct jury instruction on assessing witness credibility,

merely emphasized to jury members that their every-day manner

of assessing credibility could be employed in their jury

deliberations. Far from encouraging jury members to cast

aside their common sense, the instruction tended to encourage

its use. As such, the instruction does not provide a basis

for granting defendant a new trial.

III.

CONCLUSION

For the foregoing reasons, the judgment of the

district court is affirmed.

Affirmed.

-10-
10