989 F.2d 485
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
UNITED STATES, Appellee,
v.
Barry L. WEINSTEIN, Defendant, Appellant.
 No. 92-2123.
 United States Court of Appeals,
First Circuit.
 March 2, 1993.
 
 Appeal from the United States District Court for the District of Massachusetts
 Joseph J. Balliro with whom Balliro, Mondano & Balliro was on brief for appellant.
 Despena Fillios Billings, Assistant United States Attorney, with whom A. John Pappalardo, United States Attorney, was on brief for appellee.
 D.Mass.
 AFFIRMED.
 Before Torruella, Circuit Judge, Campbell, Senior Circuit Judge, and Stahl, Circuit Judge.
 STAHL, Circuit Judge.
 
 
 1
 In this appeal, defendant Barry L. Weinstein challenges his conviction for knowing receipt of stolen property, and for conspiracy to commit that crime. Specifically, defendant argues that his trial was unfairly prejudiced by certain comments made by the government in its closing argument, and by the district court's charge to the jury. Finding the government's comments to be harmless error, and the jury instructions proper, we affirm.
 
 I.
 FACTUAL BACKGROUND
 
 2
 The government's evidence in this case shows that in February of 1991, Michael Flatt, accompanied by a friend, broke into a safe in a private home in Dallas, Texas, and stole approximately 26 items of jewelry. The purloined items had a total resale value between $85,000 and $134,000. Flatt packaged the pieces and sent them via Federal Express to his home in Boston, Massachusetts. Upon his return to Boston, Flatt sought to have some of the jewelry appraised. He took three examples of the loot to "Roy K. Eyges, Inc.," a jewelry store in Boston, where he was introduced to defendant, a jewelry appraiser employed at the store.
 
 
 3
 Flatt told defendant that he had inherited the jewelry and that he was interested in selling it. In the privacy of defendant's office, defendant indicated that he was interested in helping Flatt sell the jewelry, but that he wanted to do so independently of his employer, so that he could obtain a commission on the sale. At this first meeting, defendant suggested that he and Flatt transact their business in cash.
 
 
 4
 The following weekend, defendant met with Flatt, and was given several pieces of the jewelry to sell. Some days later, by arrangement, the two met in a public parking garage, where defendant gave Flatt a paper bag containing between $7,000 and $9,000 in cash obtained from the sale of unspecified pieces of the stolen jewelry.
 
 
 5
 At this meeting, defendant asked about the source of the jewelry. Flatt advised defendant that he had stolen the jewelry from Texas. Defendant said that he had suspected that the jewelry was stolen. He also told Flatt that he had checked to see if the jewelry had been reported stolen, and that it had not been so reported.
 
 
 6
 Several days later, again by arrangement, defendant and Flatt met in defendant's car on a designated street in Boston. Defendant informed Flatt that defendant and a partner, co-defendant Eric Bleiler,[1] were attempting to raise money in order to purchase some of the pieces outright from Flatt. At that meeting, Flatt gave defendant approximately ten additional pieces of stolen jewelry to sell.
 
 
 7
 In the course of subsequent phone conversations, defendant told Flatt that his partner Bleiler had more cash for Flatt from the sale of some of the jewelry, and that defendant could pick up the cash at Bleiler's shop in Newton, Massachusetts, outside of Boston. Flatt went to Bleiler's shop and was given a paper bag containing approximately $9,000 in cash.
 
 
 8
 Shortly after his visit to Bleiler's shop, Flatt left Boston to live in San Francisco. Defendant notified Flatt by phone that he was interested in doing additional business with Flatt, and that he had $15,000 more in cash for Flatt from the sale of additional pieces of the stolen jewelry. Flatt requested that defendant send him the cash in San Francisco via Federal Express. Before receiving these last proceeds from the sale of the purloined jewelry, Flatt was arrested in San Francisco in connection with the Dallas burglary.[2] After his arrest, Flatt signed a written consent form allowing the San Francisco Police Department to open his mail. On April 24, 1991, the San Francisco Police intercepted and opened a package addressed to Flatt from defendant which contained $15,100 in cash.
 
 
 9
 Shortly thereafter, defendant was arrested and charged with one count of knowing receipt of stolen property in violation of 18 U.S.C. § 2315,[3] and one count of conspiracy to commit that crime in violation of 18 U.S.C. § 371.[4] After a five-day jury trial, defendant was convicted on both counts. From these convictions, defendant now appeals.
 
 II.
 DISCUSSION
 
 10
 On appeal, defendant argues that certain of the government's comments during closing argument were unfairly prejudicial. Defendant also challenges one of the court's instructions to the jury. We address each argument in turn.
 
 
 11
 A. Government's Comments During Closing Argument
 
 
 12
 The following colloquy took place during the government's closing argument:
 
 
 13
 Government: [Defendants] are not, as [defense counsel] argued to you in his opening, sitting the[re] clothed in a mant[le] of innocence and I am asking you--
 
 
 14
 The Court: Oh, yes, they are.
 
 
 15
 Defendant's counsel: Objection.
 
 
 16
 Co-defendant's counsel: Objection.
 
 
 17
 The Court: They are indeed clothed in a mant[le] of innocence. They stand before you now-sit before you now absolutely and totally innocent. They remain innocent until the government proves them guilty beyond a reasonable doubt.
 
 
 18
 Defendant argues that the government's statement had the effect of denying him the presumption of innocence, and that the comment was sufficiently prejudicial to warrant a new trial. We disagree.
 
 
 19
 The prejudicial statements of a prosecutor at trial are subject to a harmless error analysis. United States v. Hasting, 461 U.S. 499, 507-509 (1983); United States v. Brown, 938 F.2d 1482, 1489 (1st Cir.), cert. denied, 112 S. Ct. 611 (1991). Convictions will therefore not be set aside "for small errors or defects that have little, if any, likelihood of having changed the result of the trial.' " Hasting, 461 U.S. at 508 (quoting Chapman v. California, 386 U.S. 18, 22 (1967)).
 
 
 20
 In determining whether prosecutorial misconduct rises above the level of harmless error, " 'we consider the severity of the misconduct, whether it was deliberate or accidental, the likely effect of the curative instruction, aagainst appellant[ ].' " Brown, 938 F.2d at 1489 (quoting United States v. Cox, 752 F.2d 741, 745 (1st Cir. 1985)).
 
 
 21
 Having carefully considered all of the factors set forth in Brown, it is our opinion that the like it is our opinion that the likely effect of the district court's strong, correct and contemporaneous curative instruction, when combined with the court's final charge,[5] was that the jury remained properly apprised of the presumption of innocence, despite the government's improvident statement. Accordingly, we rule that the prosecutor's comment, although improper, was harmless error. See, e.g., United States v. Lilly, No. 91-2192, slip op. at 17 (1st Cir. 1992) (indicating that generally "a strong message from the bench, delivered promptly, is a satisfactory antidote to the potentially poisonous effects of an ambiguous comment or a remark that sails too close to the wind"); United States v. Maccini, 721 F.2d 840, 847 (1st Cir. 1983) (holding that district court's "strong curative instructions were sufficient to correct" the effect of government's improper statements).[6]
 
 B. Jury Instructions
 
 22
 Defendant also challenges the following jury instruction regarding the process of evaluating witness credibility:
 
 
 23
 Now, th[e] process [of evaluating witness credibility] is, as used here, no different from what you do all the time, every day in your lives. When somebody tells you a story, you make a judgment whether you believe what the person told you. You probably do it almost instinctively. And I ask you to make the same judgment, precisely the same kind of judgment, as you review the testimony of each of the witnesses.
 
 
 24
 Relying on United States v. Araujo, 539 F.2d 287, 290-91 (2d Cir.), cert. denied, 429 U.S. 983 (1976)), defendant argues that this instruction was prejudicial because it permitted jurors to rely improperly on their "instincts" rather than their common sense in assessing witness credibility. We find defendant's argument bordering on the frivolous.
 
 
 25
 The district court in Araujo, referring to particular testimony or evidence at trial, instructed the jury that human beings have a tendency or a "natural instinct" to lie when confronted with an accusation. The Second Circuit disapproved of the comment, stating that "it would be preferable if the trial judge avoided interjecting his[/her] own personal views of human nature into the charge." Id. at 291.
 
 
 26
 Plainly, the instant case is very different from Araujo. In using the term "instinctively" in the instant case, the district court, in the context of a complete and correct jury instruction on assessing witness credibility, merely emphasized to jury members that their every-day manner of assessing credibility could be employed in their jury deliberations. Far from encouraging jury members to cast aside their common sense, the instruction tended to encourage its use. As such, the instruction does not provide a basis for granting defendant a new trial.
 
 III.
 CONCLUSION
 
 27
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 28
 Affirmed.
 
 
 
 [1]
 At trial, Bleiler was acquitted of all charges against him
 
 
 [2]
 In separate proceedings, Flatt was convicted on state charges of burglary and on federal charges of interstate transportation of stolen property
 
 
 [3]
 18 U.S.C. § 2315 states in relevant part:
 Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more ... which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken ... [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both.
 
 
 [4]
 18 U.S.C. § 371 states in relevant part:
 If two or more persons conspire ... to commit any offense against the United States ... and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 
 
 [5]
 Along with its sua sponte correction, which literally cut off the government in mid-sentence, the district court also gave the following instruction in its final charge to the jury:
 Now, we have talked a lot about the presumption of innocence. It is a rule of law in this country, indeed, it is a constitutional rule, that a defendant is presumed to be innocent. And that means, very simply that the defendant is innocent. He is innocent until the government proves him guilty. And because he is innocent, he does not have to prove his innocence. He has no obligation to offer any evidence, he has no obligation to offer any explanation, he has no obligation to take the stand.
 
 
 [6]
 Defendant also challenges two implications allegedly made by the government during its rebuttal to defendant's closing argument. According to defendant, the government unfairly implied that the testimony of law enforcement officials is generally more credible than the testimony of laypersons, and that defendant's actions had violated a Boston ordinance which requires that large cash transactions be reported to the Boston Police
 Even if the government's comments carried these implications, defendant has failed to argue, let alone demonstrate, that either comment " 'changed the result of the trial.' " Hasting, 461 U.S. at 508 (quoting Chapman, 386 U.S. at 22). As defendant himself concedes, the government's case against him consisted primarily of Flatt's testimony. Neither police credibility nor the Boston ordinance were significant issues in the case against defendant.
 Moreover, the district court directly addressed defendant's concerns regarding the statements. With regard to the testimony of law enforcement officers, the district court told the jury: "You should judge [law enforcement officials] in exactly the same way as you judge everybody else. Just because they work for a law enforcement agency, doesn't make them more believable nor less believable than anybody else." With regard to the Boston ordinance, the district court instructed the jury that "neither [defendant] nor [co-defendant] Bleiler do business in Boston. So, there is no evidence one way or the other that they have any obligation to file a police report." We find these instructions more than adequate to dispel any possible prejudice from the government's statements. See, e.g., Lilly, slip op. at 17 (strong corrective instructions generally sufficient to cure improper prosecutorial comments). To the extent, therefore, that these statementswere improper, they too were harmless error.
 Similarly, we are unpersuaded by defendant's argument that the two comments had the cumulative effect of rendering the trial unfair. Given that the comments were unrelated to each other, and that each comment standing alone was at most harmless error, there simply is no basis for concluding that the comments taken together influenced the outcome of defendant's trial in any way.