UNITED STATES of America, Appellee,

v.

Donald Francis STACKPOLE,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Ray J. NORTON, Jr.,
Defendant, Appellant.

Nos. 85–1054, 85–1273.

United States Court of Appeals,
First Circuit.

Argued Nov. 5, 1986.

Decided Feb. 12, 1987.

As Amended Feb. 13, 1987.

---

Susan M. Marshall, by appointment of the Court, with whom Marshall, Rosen & Marshall, Boston, Mass., was on brief, for Donald Stackpole.

Harry C. Mezer, P.C., Boston, Mass., by appointment of the Court, for Ray J. Norton, Jr.

Ralph D. Gants and Gary S. Katzmann, Asst. U.S. Attys., with whom Robert S. Mueller, III, U.S. Atty., and Mark E. Robinson, Asst. U.S. Atty., Boston, Mass., were on briefs, for appellee.

Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and PIERAS,* District Judge.

TORRUELLA, Circuit Judge.

These consolidated appeals follow from the convictions of appellants Donald Stackpole and Ray Norton, Jr. in separate trials relating to their involvement in an arson conspiracy that set over 200 fires in the Boston area from 1982 to 1984. Appellants raise a number of objections to alleged errors by the trial judge in their respective trials, none of which merit reversal.

## I. *The Arson Ring*

The arson conspiracy began in late 1981 when a group of "sparkies"[1] decided to employ unusual and illegal means to increase public funding for firefighting and police protection in Massachusetts. They began with vandalism and nuisance fires, breaking windows and setting dumpsters on fire. When these acts failed to attract attention, they escalated to two, three and four alarm fires, torching abandoned buildings, factories, and even a lumberyard.

To start the fires the group used a time delay incendiary device they called "La Bomba." La Bomba consisted of a ziplock plastic bag filled with Coleman lantern fuel and placed in a paper bag stuffed with tissue. A lit cigarette threaded through a matchbook, set inside the bag, provided the

---

* Of the District of Puerto Rico, sitting by designation.

1. A "sparky" is someone who spends his or her free time chasing after fire trucks and who enjoys watching fires.

fuse. The cigarette burned down to the matchbook, which flared up and lit the tissue. The burning tissue then melted the plastic bag, releasing the fuel, and started the blaze.

Donald Stackpole joined the group at the beginning, but apparently did not share its goal of promoting public funding; he thought firefighters were overpaid and underworked and merely wanted to harass them. He did share, however, the group's fascination with fires. Ray Norton, Jr. came into the group's confidence in June, 1982, after the vandalism and nuisance fire stage. Norton, a ten year veteran of the Boston Fire Department, was angered by the cuts in public funding which had led to layoffs in his department. While he never set a fire, Norton offered the group support and advice. As the government showed at trial, on at least three occasions Norton recommended to the group the burning of specific buildings. Also, as a member of the Fire Department, Norton was able to track the activities of the arson squad and was thus able to protect the group from detection by the authorities.

The conspiracy unravelled when one member, Robert Groblewski, appeared on a T.V. news film of a major fire brandishing a revolver. After observing this bizarre behavior, the arson squad tracked him down, and he ultimately confessed. Groblewski then cooperated with the government in return for a light sentence recommendation. His cooperation included the tape recording of plans by Stackpole and others to spirit him out of Massachusetts. Eventually all the members of the conspiracy, except Stackpole and Norton, pled guilty. Four of them testified against Stackpole and two against Norton.

After thirteen days of trial, the jury convicted Stackpole of conspiracy to set the fires, eight counts of the making and possession of an unregistered explosive device, five counts of the arson of an interstate facility by means of fire and explosive and,

for his involvement in activities to hide the arson conspiracy, two counts of the attempting to obstruct justice and of conspiracy to obstruct justice. The judge sentenced him to 40 years imprisonment. Norton was later convicted, after a 17 day trial, of conspiracy to commit arson and to manufacture unregistered incendiary devices, arson of an interstate facility, and perjury before the grand jury, for which he received a sentence of 6 years imprisonment. Both appealed to this court.

## II. *The Stackpole Appeal*

Stackpole raises four issues on appeal. First, he claims that La Bomba was not an explosive device. Second, he argues that the joinder of the arson and related counts with the obstruction of justice counts was prejudicial. Third, he challenges the trial court's ruling limiting the cross examination of an investigative agent of the Bureau of Alcohol, Tobacco and Firearms as having prevented him from demonstrating bias. And finally, he asserts that the admission of a taped interview, in which he refused to take a lie detector test, was incurably prejudicial.

## A. *La Bomba*

■ As in effect at the time of the conspiracy's earlier fires, Federal law prohibited arsons of property only when the arson was committed "by means of an explosive." 18 U.S.C. § 844(i).[2] The Federal arson statute defined "explosive" in three ways:

1. "gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuses (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders ...."

2. "any chemical compounds, mechanical mixture, or device that contains any oxiding and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or

---

**2.** On October 12, 1982, Congress amended 18 U.S.C. § 844(i) to add destruction caused "by means of fire" to the domain of federal arson

jurisdiction. Appellant does not challenge the applicability of the amended statute to the later fires.

by detonation of the compound, mixture, or device or any part thereof may cause an explosion;" or

3. "other explosive or *incendiary devices* within the meaning of paragraph (5) of section 232 of this title."

18 U.S.C. § 844(j) (emphasis supplied). 18 U.S.C. § 232(5) defines an "explosive or incendiary device" as

"any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone."

La Bomba meets the definition of incendiary devices. The ziploc bag filled with Coleman lantern fluid constitutes "a breakable container including a flammable liquid." The cigarette threaded through a matchbook and the tissue paper constitute "a wick composed of any material which, when ignited is capable of igniting such flammable liquid." And, La Bomba "can be carried ... by one individual acting alone." Accordingly, it was an explosive device within the meaning of 18 U.S.C. § 844(j) at the time of all the fires and, therefore, its use was a federal offense.

B. *Joinder of the Arson-Related Counts with the Obstruction of Justice Counts*

Before trial Stackpole moved for a severance of the arson-related counts from the obstruction of justice counts under Fed.R. Crim.P. 14.[3] On appeal he seeks to add a Fed.R.Crim.P. 8(a)[4] argument as well. "This is too late, ... at least in the absence of plain error, but there was no error under either rule." *United States v. Barbosa,* 666 F.2d 704, 707 (1st Cir.1981).

■ Rule 8(a) permits joinder of offenses if they "are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." In this case, the joined counts charge two distinct conspiracies, one to commit arson and the other to obstruct prosecution for that arson. While the arson and obstruction of justice activities were sufficiently separable to constitute two conspiracies, they were, nonetheless "connected together" and part of "a common scheme or plan." The second conspiracy was formed to protect the first from prosecution. *See United States v. Berardi,* 675 F.2d 894, 900–01 (7th Cir.1982) (joinder of obstruction of justice count with mail fraud and extortion counts).

Offenses properly joined under Rule 8 may nonetheless be severed under Rule 14 if a party can "make a 'strong showing of prejudice' likely to result from a joint trial." *United States v. Luna,* 585 F.2d 1, 4 (1st Cir.), *cert. denied,* 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978) (quoting *Sagansky v. United States,* 358 F.2d 195, 199 (1st Cir.1963)). The standard of review for denial of a Rule 14 motion is abuse of discretion. *See id.* Here Stackpole has not demonstrated sufficient prejudice.

---

3. Rule 14. Relief from Prejudicial Joinder
  If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

4. Rule 8. Joinder of Offenses and of Defendants
  (a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

■ Were the counts severed, substantially the same evidence would have been admitted in both resulting trials. In a trial on the arson and related charges, the obstruction of justice acts would have been admissable to show consciousness of guilt. *See United States v. O'Connell*, 703 F.2d 645, 649 (1st Cir.1983). And in a trial on the obstruction of justice counts, the arson activities would have been admissible to show motive. *See United States v. Benz*, 740 F.2d 903, 912 (11th Cir.1984). Appellant's contrary claim, that the jury was so confused by the joinder that they were unable to consider each count separately, is conclusory and, in any event, contradicted by the verdict the jury reached. The jury acquitted Stackpole on one arson related count and on one obstruction of justice related count, while convicting him of the remaining fifteen counts.

### C. *Cross Examination of Agent Miller*

■ At trial, the government called Special Agent Wayne Miller, of the Bureau of Alcohol, Tobacco and Firearms ("ATF"), to testify about the ATF investigation of the arsons. Stackpole attempted to cross examine Agent Miller regarding organizational problems and funding levels of the ATF. This questioning, Stackpole claims, would have revealed that the Bureau was under considerable pressure to solve the case and, consequently, that the witness was biased against Stackpole. On appeal, Stackpole asserts that the district court's refusal to permit such cross examination violated his Sixth Amendment right of confrontation.

We disagree. Stackpole had ample opportunity to cross examine Agent Miller on other matters affecting his credibility. The permitted cross examination met the "constitutionally required threshold level of inquiry" after which the trial court has "discretion to limit the scope of cross examination." *United States v. Tracey*, 675 F.2d 433, 437 (1st Cir.1982). The test for abuse of that discretion "is whether the jury had

sufficient other information before it, without the excluded evidence, to make a discriminating appraisal of the possible biases and motivations of the witness." *Id.* We conclude that the jury did, especially considering the small part Agent Miller's testimony played in the trial. Permitting the cross examination would have required an extensive and irrelevant inquiry into political and budgetary conditions affecting the Bureau, and whether these conditions were sufficient motivation to "frame" Stackpole. This inquiry might well have confused the jury and distracted them from evaluating the evidence against Stackpole. *See United States v. Jarabek*, 726 F.2d 889, 902 (1st Cir.1984) ("[t]he very slight probative value of such evidence on the issue of bias does not overcome the strong likelihood of confusion on the central issues in the case and undue delay in the trial"). The district judge properly exercised her discretion to limit the cross examination.

### D. *The On-Tape Refusal to Take a Lie Detector Test*

Part of the government's evidence consisted of a tape recorded and transcribed interview between Stackpole and ATF agents, in which, on page 15 of a 21 page transcript, Stackpole refused to take a lie detector test. The government provided a copy of the tape and the transcript to Stackpole prior to trial. At trial, Stackpole made no objection to its introduction into evidence. He did not object until the tape was being played to the jury. The judge overruled the objection and permitted the jury to hear the entire tape. Later, at the conclusion of all the evidence, the judge offered a curative instruction.

■ While the tape ruling was error, *see United States v. Cardarella*, 570 F.2d 264, 266–67 (8th Cir.), *cert. denied*, 435 U.S. 997, 98 S.Ct. 1651, 56 L.Ed.2d 87 (1978), and while the correct practice would have been to delete the offensive portion of

the tape, in the circumstances the playing of the entire tape recording was harmless. Adapting the harmless error standard which we first enunciated in *United States v. Capone*, 683 F.2d 582, 586–87 (1st Cir. 1982), our decision here rests on the following four factors. First, the playing of the tape recording was the only reference, other than the curative instruction, to Stackpole's refusal to take a lie detector test. Second, the government's conduct does not appear to be deliberately prejudicial. The prosecutor entered the tape and transcript into evidence only after giving the defendant opportunity to review and object to the contents; no objection was raised until after the prosecutor had begun playing the tape to the jury, presenting the judge with a difficult situation created by defendant's counsel's conduct. Third, at the conclusion of the evidence the trial judge gave the following "strong, explicitly cautionary instruction," *Capone*, at 587:

> There was also, in this connection, some evidence in one of the tapes that he refused to take a polygraph test. You may draw no inference from that, either. He has an absolute right, anybody has an absolute right not to take a polygraph test. That does not mean that he is guilty of the offense and you may not infer from it that he is guilty from [sic] the events. It has nothing whatever to do with his guilt or innocence on these charges.

And, finally, "it is most unlikely that any prejudice that survived the judge's instruction could have affected the outcome of this case." *Id.* The evidence against Stackpole was overwhelming. Four of his co-conspirators testified against him. Tape recordings detailing his efforts to obstruct the criminal investigation strongly suggested an awareness of guilt. Even defense counsel conceded, in closing argument, that the evidence of Stackpole's involvement in the conspiracy was "mountainous" and came from "diverse and independent sources."

## III. *The Norton Appeal*

Appellant Norton also raises four issues on appeal. First, Norton claims that the trial judge mishandled discovery relating to his possible mental competency defense, thereby preventing the mounting of an effective defense. Second, he argues that the jury was biased due to pretrial publicity and the judge's voir dire questions relating to immunized witnesses. Third, he asserts that the judge improperly denied his motion for acquittal. And fourth, he challenges the jury instructions on perjury and arson as erroneous. We will address these issues in reverse order.

### A. *Jury Instructions on Perjury and Arson*

■ The perjury count in the indictment charged Norton with lying to the grand jury in his responses to two particular questions regarding his knowledge of the involvement of specific people in the arson conspiracy. Norton claims that the trial judge's instructions to the jury on the perjury count improperly took away the question of "materiality" from the jury and, further, that the instructions conflicted with the indictment, because the instructions told the jury to convict if Norton made *any* misstatement to the grand jury, not just the two in the indictment. Appellant is wrong on both counts. First, it is well settled in our circuit that the issue of materiality in a perjury trial is a question of law for the judge. *See United States v. Scivola*, 766 F.2d 37, 44 (1st Cir.1985); *United States v. Kehoe*, 562 F.2d 65, 68 (1st Cir.1977). Appellant has not claimed that his denial of knowledge of the arson conspiracy was not, as a matter of law, material in this case. Second, the trial judge did not instruct the jury that *any* misstatement to the grand jury would be perjury, but rather that the *specific* misstatements alleged in the indictment would be perjury if false. Appellant's argument

in his brief to the contrary quotes the district court out of context and borders on misrepresentation to this court. *Compare* Appellant's Brief at 26 *with* Trial Transcript, Sixteenth Day, Charge to the Jury, at 16–32 to 16–34.

With regard to the arson instructions, appellant fares no better. Appellant's first claim, that the judge improperly took away from the jury the question of whether a particular building that was burned was held in interstate commerce, misconstrues the jury instructions. His second claim, that the instruction on intent was inadequate, is wrong as a matter of law. And his third claim, that the judge abused her discretion in giving a *Pinkerton* instruction, is unconvincing.

■ Appellant's interstate commerce instruction argument, like his perjury argument, borders on misrepresentation. The judge instructed the jury that, "if you believe it," the testimony that Roxbury Crushed Stone bought machines in other states and sold stone to other states "constitutes a sufficient nexus between interstate commerce." Trial Transcript, Sixteenth Day, Charge to the Jury, at 16–22. The judge did not instruct the jury that the building *was* used in interstate commerce, but rather that *if they believed* some particular testimony, that testimony would be enough on that issue. *Compare United States v. Gollin*, 166 F.2d 123, 126–27 (3d Cir.), *cert. denied*, 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151 (1948) (reversible error to instruct that the interstate nature of a shipment was undisputed).

■ The intent instruction also was adequate. The judge instructed the jury that the government must prove that the defendant "did something to further the success of the venture and shared in the criminal intent of the others." Trial Transcript, Sixteenth Day, Charge to the Jury, at 16–28. She instructed the jury further that the criminal intent necessary was "that he

did so maliciously, knowingly, willfully" and that "maliciously ... simply means to act on purpose, without justification or excuse to cause injury." *Id.* at 16–31 to 16–32. That was a correct and adequate explanation of the specific intent required for conspiracy. *See, e.g., United States v. Bertolotti*, 529 F.2d 149, 159 (2d Cir.1975).

■ The *Pinkerton* instruction was also correctly given. *See Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). This is not the sort of marginal case Judge Friendly was concerned with in *United States v. Sperling*, 506 F.2d 1323, 1341–42 (2d Cir.1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). *See United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir.1976). The evidence of Norton's involvement in the conspiracy, as set out in the next section, was considerable. The trial judge did not abuse her discretion in giving the charge. *See United States v. Alvarez*, 626 F.2d 208, 210–11 (1st Cir.1980).

### B. *Motion for Acquittal*

■ The evidence was sufficient to support both findings that Norton challenges: that he was part of the conspiracy and that the building he allegedly suggested be torched was used in interstate commerce. With regards to his joining the conspiracy there was abundant evidence presented at trial. To recite only a few examples, he was seen at fires with the other conspirators. His co-conspirators testified that he suggested buildings to burn on at least three occasions and that he generally counseled and encouraged them. His voice was identified on a Cambridge Fire Department emergency phone line tape saying "Cambridge tonight boys" and "Eddie Fowler [a Cambridge arson investigator] didn't catch me." And he allowed two members of the group to use his basement to make La Bomba for a building he suggested they burn.

■ There was also sufficient evidence that the facility burned in the West

Roxbury Crushed Stone fire was used in interstate commerce. The vice-president and general manager of the crushed stone company identified invoices showing that stone crusher parts were purchased in Milwaukee and gears from California and that other parts were purchased from companies in other states. Norton challenges that these invoices do not show that the particular buildings burned, which consisted of wooden bins for storing stone, were used in interstate commerce. Such specificity is not required, however. Rather, it is sufficient to show, as the government did, that "in the regular course of business the company received goods ... that had originated outside the state." *United States v. Nashawaty*, 571 F.2d 71, 75 (1st Cir.1978). *See also Russell v. United States*, 471 U.S. 858, 105 S.Ct. 2455, 2456, 85 L.Ed.2d 829 (1985) (arson statute "expresses an intent by Congress to use its full power under the Commerce Clause").

### C. *Jury Bias and Discovery Allegations*

We will only briefly respond to Norton's allegations of jury bias and discovery abuse, because we find these arguments even less meritorious than the preceding. The judge's voir dire questioning was fair and balanced; it did not suggest, as Norton argues, that immunized witness should be believed. The cautionary instruction regarding accomplice testimony that Norton now demands on appeal is not even required in the charge to the jury, let alone in voir dire. *Cf. United States v. House*, 471 F.2d 886, 888 (1st Cir.1973) (recommending cautionary instruction in charge to jury).

■ While pretrial publicity regarding the Stackpole trial appears to have been widespread and some of the jurors appear to have had some general knowledge about the fires in the Boston area, the publicity did not rise to prohibitive standards. *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). "[T]he relevant question is not whether the community remembered the case, but whether the jurors ... had such fixed opinions that they could not judge impartially the guilt of defendant[s]." *Id.* at 1035, 104 S.Ct. at 2891. The trial court's "questions were well calculated to insure the selection of an impartial jury." *United States v. Samalot Pérez*, 767 F.2d 1, 5 (1st Cir.1985). Furthermore, her handling of publicity matters during the trial conformed to required standards as set forth in *United States v. Perrotta*, 553 F.2d 247, 249-50 (1st Cir.1977).

■ Finally, Norton's allegations of discovery abuse relate to the government's reciprocal discovery, under Fed.R.Crim.P. 16(b), regarding his possible mental competency defense. Defendant himself gave notice that he would raise this defense, and, in fact, used it to obtain a severance from the Stackpole trial. That the government would seek to have Norton examined by its own expert and to examine Norton's evidence regarding mental competency followed from Norton's own Rule 16(a) request. The government's requests were not improper. *See United States v. Nobles*, 422 U.S. 225, 235, 95 S.Ct. 2160, 2168, 45 L.Ed.2d 141 (1975) (government's right to discovery arises after defendant seeks discovery). Reciprocal discovery is a two way street.

### *Conclusion*

We find no reversible error in the case of either appellant. Accordingly, the judgments below are hereby affirmed.

*Affirmed.*