February 2, 1993

United States Court of Appeals
For the First Circuit

No. 92-1587

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

MICHAEL IDOWU TUNDE AKINOLA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge, and

Stahl, Circuit Judge.

David N. Cicilline for appellant.

Gerard B. Sullivan, Assistant U.S. Attorney, with whom Lincoln C.

Almond, U.S. Attorney and Margaret E. Curran, Assistant U.S. Attorney,

were on brief for appellee.

February 2, 1993

STAHL, Circuit Judge. Defendant-appellant Michael

Idowu Tunde Akinola ("Akinola") launches a five-pronged

attack on his conviction for conspiracy to possess with

intent to distribute heroin and possession with intent to

distribute heroin.1 We address the following claimed errors

in detail: 1) unconstitutional denial of chosen counsel when

the Magistrate Judge denied his desired counsel's motion for

admission pro hac vice; 2) erroneous denial of his motion for

judgment of acquittal; 3) the impermissible prosecutorial

comment on his failure to testify and the trial court's

subsequent inadequate curative instruction; and 4) the trial

court's improper jury instruction. For the reasons set forth

below, we affirm both counts of conviction.

I.

Factual Background

We begin by summarizing the evidence in the light

most favorable to the government. United States v. Abreu,

952 F.2d 1458, 1460 (1st Cir.), cert. denied, U.S. ,

112 S. Ct. 1695 (1992).

On June 30, 1991, Patrolman Donald L. Mong of the

East Greenwich, Rhode Island, Police Department, was working

a routine patrol in a marked cruiser. At approximately 5

1. Akinola was arrested, tried and convicted along with a
co-defendant, Joseph Gullity, whose appeal we have already
decided. United States v. Gullity, No. 92-1586 (1st Cir.

Dec. 14, 1992) (unpublished).

-2-
2

p.m., Mong noticed that a car which had just passed

perpendicular to his ("the suspect car") did not have a front

license plate. Mong and Akinola made eye contact as the

suspect car passed Mong. Mong pulled out and began to follow

the vehicle, in which Akinola was the driver and Gullity the

passenger. When Mong positioned himself behind the suspect

car, it accelerated and began to pull away from Mong,

eventually reaching a speed of 50 miles per hour in a

residential area posted for 25 miles per hour. Mong closed

the gap sufficiently so that he could read the vehicle's rear

license plate number which he transmitted to police

headquarters in order to obtain as much information about the

car as possible.

As appellant's car slowed for intersection traffic,

Mong shortened the distance between the two vehicles. He

then observed Akinola and Gullity having a spirited

conversation in which he could see Akinola's head moving and

his lips moving fast "as though he was trying to get out a

lot of information quickly." After traffic cleared, the

suspect car turned left at the intersection, followed by

Mong. Again, the suspect car began pulling away from Mong,

despite the latter's speed of 50 miles per hour. At that

time, the two vehicles were travelling in a 35 mile per hour

zone. The suspect car soon approached the vicinity of an

entrance ramp for interstate route 95. Although Mong had yet

-3-
3

to receive any information on the suspect car, he wanted to

avoid following it onto the interstate, and thus activated

his car's emergency overhead lights. The suspect car did not

enter the interstate, nor, however, did it stop in response

to the emergency lights. Mong then flashed his car's

headlights and turned on his siren, after which Akinola

appeared to glance into his rear-view mirror. After

travelling approximately 200 yards further, and passing at

least two areas suitable for pulling over, Akinola entered a

movie theater parking lot, stopping the vehicle near the

front of the theater entrance. Between Mong radioing for

information and the suspect car stopping, the vehicles

covered about one and one-half miles.

As Mong was informing his dispatcher that both

vehicles had stopped, Akinola exited his vehicle and began

yelling at Mong in an "agitated" manner. Mong then exited

his vehicle, while Akinola continued toward him, yelling at

Mong and toward Gullity--who was still seated in the car--in

English to Mong and to Gullity in another language which Mong

did not understand, which later turned out to be the African

dialect Yoruba. Although Mong ordered Akinola to return to

his car, Akinola continued towards him, still yelling

bilingually. Akinola then began shoving Mong, but after a

scuffle, Mong was able to pin Akinola on the ground, handcuff

him, and then lock him in the rear of his cruiser.

-4-
4

Meanwhile, during the Mong-Akinola imbroglio, Gullity

walked into the theater lobby. After securing Akinola, Mong

brought Gullity back to the parking lot, whereupon a citizen

bystander, Michael Melchor, directed Mong's attention to a

nearby vehicle, under which Melchor claimed he had seen

Gullity kick an object he had removed from his shirt pocket.

Mong retrieved the object, which turned out to be a tissue

containing 46.5 grams of heroin. Akinola was subsequently

indicted and convicted on charges of conspiracy to possess

with intent to distribute heroin, in violation of 21 U.S.C.

841(a)(1), (b)(1)(c) and 846, and possession with intent

to distribute heroin, in violation of 21 U.S.C. 841(a)(1),

(b)(1)(c). Following his conviction, he was sentenced to a

term of 46 months imprisonment.

II.

Pretrial Proceedings

Akinola initially appeared in district court on

July 15, 1991, at which time attorney John F. Cicilline

entered an appearance on Akinola's behalf. A probable cause

and detention hearing was then scheduled for July 18, 1991.

On the scheduled date, attorney John M. Cicilline appeared on

behalf of Gullity, and attorney David N. Cicilline attempted

to represent Akinola. John F. Cicilline was not present at

the hearing. Magistrate Judge Boudewyns did not permit David

N. Cicilline to represent Akinola because he was not a member

-5-
5

of Rhode Island's District bar and because John F. Cicilline

was still listed as counsel of record and had not withdrawn

from the case. The Magistrate Judge also denied John M.

Cicilline's motion to admit David N. Cicilline pro hac vice,

but scheduled a hearing for July 23, 1991, to further

consider the matter.

John F. Cicilline appeared at the July 23, 1991,

hearing and requested the Magistrate Judge to reconsider his

denial of the pro hac vice motion. That request was denied

for several reasons, which appellant now argues were

erroneous. We need not address the merits of this particular

claim, however, because appellant's failure to preserve the

issue leaves us without jurisdiction to consider the matter.

A brief explanation follows.

The courts of appeals have jurisdiction over

appeals "from all final decisions of the district courts of

the United States." 28 U.S.C. 1291; United States v.

Ecker, 923 F.2d 7, 8 (1st Cir. 1991). Furthermore, "[t]o be

a final order of the district court within the meaning of

section 1291, the magistrate's decision must have been

reviewed by the district court, which retains ultimate

decision-making power." Id. (quoting Siers v. Morrash, 700

F.2d 113, 115 (3d Cir. 1983) and cases cited therein)

(internal quotes omitted). See generally Pagano v. Frank,

No. 92-1952, slip op. at 4-7 (1st Cir. Jan. 13, 1993). In

-6-
6

the case at bar, there is no dispute that the Magistrate

Judge's order was not brought before the district court via

either of the two methods countenanced in Ecker.2 Appellant

seeks to bypass this apparent jurisdictional blockage by

arguing that his apparent default is excused by the

Magistrate Judge's lack of warning, in his order, that

failure to seek district court relief would result in waiver

of appellate rights. It is true, as appellant asserts, that

United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1986)

mandated such notice in certain cases to protect the rights

of pro se litigants. But here, Akinola was represented by

experienced counsel at the time of the Magistrate Judge's

ruling. Moreover, as we pointed out during oral argument,

even when such a warning is required, it is necessary only as

part of a Magistrate Judge's report and recommendation to the

district judge, 28 U.S.C. 636(b)(1)(B), (C), and not when

the Magistrate Judge issues a non-dispositive order. 28

U.S.C. 636(b)(1)(A); See, e.g., M.S. Chambers & Son, Inc.

v. Tambrands, Inc., 118 F.R.D. 274, 279 (D. Mass. 1987)

(giving waiver notice only "to the extent that [Magistrate's]

2. In Ecker we noted the existence of two categories of

magistrate's orders--"self-operating" and "non-self-
operating." The former type, pursuant to 28 U.S.C.
636(b)(1)(A), which cover most pre-trial and discovery
matters, are valid when entered and can be challenged by a
motion for reconsideration directed to the district court.
Non-self-operating orders are not valid until the district
court accepts the magistrate's report and recommendation and
enters an order or judgment. 28 U.S.C. 636(b)(1)(A), (B).

-7-
7

ruling may be considered a report and recommendation").

Therefore, the lack of such notice in this case is of no help

to appellant, and thus we are without jurisdiction to

consider the Magistrate's pro hac vice ruling.

III.

Alleged Trial Errors

A. Denial of Rule 29 Motion for Acquittal
A. Denial of Rule 29 Motion for Acquittal

As we have recently reiterated, we review the

district court's denial of a Rule 29 motion by "scrutinizing

the record in the light most favorable to the prosecution and

drawing all reasonable inferences in favor of the verdict."

United States v. Gonzalez-Torres, No. 91-2140, slip op. at 5

(1st Cir. Nov. 20, 1992) (citing United States v. Amparo, 961

F.2d 288, 290 (1st Cir.), cert. denied, U.S. , 113 S.

Ct. 224 (1992)). If, upon such a reading of the record, we

conclude that a rational jury could have found the defendant

guilty beyond a reasonable doubt, then we must affirm the

district court. Id.; United States v. Plummer, 964 F.2d

1251, 1254 (1st Cir.), cert. denied, U.S. , 113 S. Ct.

350 (1992). Moreover, the prosecution need not exclude every

reasonable hypothesis of innocence and may prove its entire

case through the use of circumstantial evidence, so long as

the totality of the evidence permits a conclusion of guilt

beyond a reasonable doubt. Gonzalez-Torres, No. 91-2140, slip

op. at 5 (citations omitted).

-8-
8

1. Possession with Intent to Distribute

In order to convict Akinola of possession with

intent to distribute heroin, the government must prove that

he knowingly and intentionally possessed the heroin and that

he did so with the intent to distribute it. Unites States v.

Barnes, 890 F.2d 545, 549 (1st Cir. 1989), cert. denied, 494

U.S. 1019 (1990); United States v. Latham, 874 F.2d 852, 863

(1st Cir. 1989). In addition, and especially relevant to the

case at bar, the government need not prove that Akinola

actually possessed the heroin. Instead, proof of

constructive possession is sufficient to support a

conviction. United States v. Martinez, 922 F.2d 914, 923 (1st

Cir. 1991); Latham, 874 F.2d at 861. Constructive

possession may be proved by demonstrating defendant's power

and intent to exercise ownership, dominion, or control over

the contraband itself, or over the area in which the

contraband was concealed. Constructive possession may be

sole or joint and may be achieved directly or through others.

United States v. Ocampo-Guarin, 968 F.2d 1406, 1409-10 (1st

Cir. 1992) (citations and quotations omitted); United States

v. Vargas, 945 F.2d 426, 428 (1st Cir. 1991) (citations

omitted).

The government concedes that it has no direct

evidence of Akinola's actual possession of the heroin.

-9-
9

Instead, the case against Akinola is based on an inferential

chain of circumstantial evidence. The government argues that

Akinola's actions after he became aware of Mong's presence

all support the conclusion that he had knowledge of the

heroin in Gullity's pocket. Specifically, the government

relies on Mong's testimony that Akinola suddenly accelerated

after he and Mong made initial eye contact, speeding through

a residential neighborhood at twice the speed limit. Later,

when Akinola was forced to slow for traffic, he and Gullity

were seen in an animated conversation, which the government

claims related to the heroin and what to do in the face of

Mong's presence. Next, the government points to Akinola's

failure to yield after Mong activated his lights and sirens,

passing at least two suitable turnoffs before pulling into

the movie theater parking lot, as further evidence of

evasion. In addition, the government argues that Akinola's

physical assault on Mong was an attempt at creating a

diversion so that Gullity could dispose of the heroin.

Finally, the government claims that Akinola was shouting to

Gullity in the Yoruba language in order to give Gullity

instructions which Mong would be unable to understand. The

government argues that Akinola was instructing Gullity to

dispose of the heroin, which Gullity did, albeit

unsuccessfully.

-10-
10

Appellant contends that any inference of either

knowledge or dominion and control drawn from the above

described events is nothing more than rank speculation,

resulting from the government's attempt to "pile inference

upon inference." Although this is a close case, we reject

appellant's exhortations.

Based on the evidence of Akinola's evasive actions

following the initial contact with Mong, the jury could infer

that he knew of the heroin in Gullity's pocket. Further, the

jury could conclude that the pair's animated conversation was

a reflection of Akinola's knowledge of the heroin.

Additionally, a rational jury could conclude that Akinola's

initiation of physical conflict with Mong was a diversion

intended to allow Gullity to get away with, or dispose of,

the heroin. The jury could have also found that Akinola's

Yoruban communication to Gullity related to the heroin, given

the temporal proximity between Akinola's actions, his

unprovoked assault on Mong, the communication, and Gullity's

actions. Moreover, the same events could lead a jury to

conclude that Akinola--through Gullity--was attempting to

exercise his dominion and control over the heroin. Finally,

evidence indicated that the amount of heroin seized was

equivalent to 2,300 doses. That fact, combined with

testimony to the effect that neither Akinola nor Gullity were

-11-
11

heroin users, supports a conclusion that the heroin was

intended for distribution. See Vargas, 945 F.2d at 428-29.

With respect to appellant's claim of inference-

piling, we recall, as we did in a recent case, the words of

Judge Aldrich:

The rule is not that an inference, no
matter how reasonable, is to be rejected if it
in turn depends upon another reasonable
inference; rather, the question is whether the
total evidence, including reasonable
inferences, when put together is sufficient to
warrant a jury to conclude that defendant is
guilty beyond a reasonable doubt.

United States v. Clifford, No. 92-1748, slip op. at 6 (1st

Cir. Nov. 20, 1992) (quoting Dirring v. United States, 328

F.2d 512, 515 (1st Cir. 1964)). Based on the foregoing, we

find the evidence of Akinola's constructive possession of the

heroin is sufficient to sustain his conviction for possession

with intent to distribute heroin.

2. Conspiracy to Possess with Intent to Distribute

To support Akinola's conviction on this count, the

government must prove the existence of a conspiracy, the

defendant's knowledge of it, and his participation in it. In

addition, the government must show Akinola's intent to both

agree with his co-conspirator, and to commit the substantive

offense. Clifford, slip op. at 2.

"A criminal conspiracy is a tacit or explicit

agreement to perform an unlawful act, which can be

established by direct or circumstantial evidence that the

-12-
12

putative co-conspirators agreed and intended to facilitate

the aims of the alleged unlawful activity." Vargas, 945 F.2d

at 429 (citations and internal quotations omitted).

The government essentially argues that the same

circumstantial facts which supported Akinola's guilt on the

possession count also support the conspiracy conviction.

Appellant argues that the government's case is based on

little more than Akinola's presence in the vehicle with

Gullity. We disagree that the evidence in this case supports

a finding of no more than that Akinola was merely present

with Gullity.

As we have already noted, the jury could have found

that Akinola knew of the heroin prior to Mong's presence

based on his sudden acceleration at the sight of Mong. In

addition, the animated conversation and Akinola's actions in

the parking lot, when he first shouted toward Gullity and

then attempted to create a diversion for him, could be

indicative of the existence of an agreement between them.

This is especially true since the parking lot incident

occurred soon after their animated conversation, which

occurred after Mong had been following for some time.

Although this count, too, presents a close call, we conclude

that a rational jury could reasonably infer from Akinola's

actions the existence of an agreement with Gullity to possess

with intent to distribute the heroin.

-13-
13

B. Prosecutorial Misconduct and Curative Instruction

During closing argument, the prosecutor made the

following statement:

We must show you that defendant Akinola
knew the heroin was there. And we do
that by showing a high speed chase, an
animated conversation, a failure to
yield, an unprovoked physical assault and
yelling in a foreign language which are

unexplained by anything other than

knowledge of the heroin in the car.

(emphasis added)

Defense counsel objected, on the basis that the emphasized

portion of the argument constituted impermissible comment on

Akinola's failure to testify. The trial court initially

overruled the objection, but then, sua sponte, gave the

following instruction to the jury:

Excuse me. I don't mean to interpret
(sic) you, Mr. Sullivan. Let me make one
thing clear to the jury. I am sure Mr.
Sullivan says unexplained, what he is
referring to is unexplained by the facts
that have been presented to you. As I
told you before, the defendants don't
have any obligation to explain anything.
And I'm sure that's what Mr. Sullivan is
referring to.

On appeal, Akinola reiterates the claim of impermissible

comment, and also claims that the trial court's curative

instruction was so deficient as to compound the prosecution's

error. We disagree.

It is beyond question that comment on a defendant's

failure to testify is violative of the Fifth Amendment

-14-
14

guarantee against self-incrimination. Griffin v. California,

380 U.S. 609 (1965); United States v. Lavoie, 721 F.2d 407

(1st Cir. 1983), cert. denied, 465 U.S. 1069 (1984). The

standard by which we review potential violations is

whether, in the circumstances of the
particular case, the language used was
manifestly intended or was of such
character that the jury would naturally
and necessarily take it to be a comment
on the failure of the accused to testify.

United States v. Glantz, 810 F.2d 316, 322 (1st Cir.), cert.

denied, 482 U.S. 929 (1987) (citations and quotations

omitted). We review any such violation for harmless error.

United States v. Hasting, 461 U.S. 499, 508-12 (1983);

United States v. Cox, 752 F.2d 741, 746 (1st Cir. 1985). See

generally United States v. Lilly, No. 92-2192, slip op. at

14-16 (1st Cir. Dec. 4, 1992).

Having read the challenged comment in the context

of the entire closing argument, we are satisfied that the use

of the word "unexplained", while perhaps unfortunate, did not

stray into forbidden territory nor was it intended to do so.

Instead, consistent with the circumstantial nature of the

case, the prosecutor recounted each of the events culminating

in Akinola's arrest, and followed each by suggesting to the

jury the government-preferred inference.3 In using

3. Some examples include, "The only reason Akinola did that
was his knowledge of the heroin;" "There is no other
plausible explanation for Akinola jumping out of the car."

-15-
15

"unexplained," the prosecutor was attempting to reinforce his

thesis that Akinola's actions could only be interpreted in

one way, and could not logically be consistent with anything

except Akinola's guilt.

The prosecutor's comments here are somewhat

reminiscent of those in United States v. Skandier, 758 F.2d

43 (1st Cir. 1985), where the prosecutor concluded his

argument by saying:

[I] will have a chance to speak with you
one more time and see if [defense
counsel] can explain the story that would
be any different with regard to the
responsibility of the defendant in this
case. So I submit to you that he cannot.

Id. at 45.

We concluded that such a "`how-does-he-explain'" argument was

improper for two reasons--the Fifth Amendment transgression,

and the apparent shift of the burden of proof to the

defendant. Id. In reaching that conclusion, we relied in

part on United States v. Wilkins, 659 F.2d 769, 774 (7th

Cir.), cert. denied, 454 U.S. 1102 (1981), wherein the court

held that the prosecutor's statements that the government's

theory was the "only explanation" and "[s]ee if defendant's

attorney explains ... " were improper comment on defendant's

failure to testify. Unlike Skandier, however, the

prosecutor's remark here was clearly aimed at the evidence,

-16-
16

rather than at the defendant. Thus, we find that the comment

here at issue did not run roughshod over Akinola's rights.4

C. Final Jury Instructions

Appellant assigns two errors to the trial court's

final instructions. First, appellant argues that the trial

court neglected to explain that while it might draw

inferences from circumstantial evidence, it was not

permitted to engage in speculation or conjecture to do so.

However, at the close of trial, the judge instructed the

jury, inter alia, to

Bear in mind though, as I said before,
that in order to draw such an inference
[from circumstantial evidence] you have
to be careful that the inference is a
reasonable one and that it is directly
based on facts that have been proven by
the direct evidence, the testimony of
witnesses or exhibits.

Having read the instructions in their entirety, including the

above-quoted section, we conclude that while the trial court

did not use appellant's suggested words, the jury members

4. We note further that while the court's immediate curative
instruction dealt with the burden of proof shift and made no
mention of the Fifth Amendment, the court twice gave the jury
Fifth Amendment instructions, including once just before
deliberations. Based on that combination of instructions, we
are satisfied that any error was rendered harmless. Indeed,
in a close case such as this, it is the combination of the
trial judge's instructions, and not the "strong evidence of
defendant's guilt"--as described by the government--that
would render the prosecutor's putative violation harmless.
Cf. Lilly, slip op. at 19 (strength of government's case

contributed to rendering harmless potentially improper
prosecutorial comment); Skandier, 758 F.2d at 46 (same).

-17-
17

were adequately apprised of the proper legal standard to

employ. See, e.g., United States v. Noone, 913 F.2d 20, 30

(1st Cir. 1990), cert. denied, U.S. , 111 S. Ct. 1686

(1991) (refusal to give the particular instruction requested

is not error where the court's instruction substantially

covers the request and the applicable law).

Appellant next argues that the trial court erred in

its instructions regarding appellant's failure to testify,

about which the court said that the jury "ought not"

penalize the defendant for exercising the right not to

testify, and "should not" draw inferences from one who has

done so. Appellant argues that the trial court's failure to

use "must not" in those circumstances is reversible error.

We disagree.

After defense counsel objected to the "ought not"-

"should-not" charge, the judge supplemented his charge by

telling the jury, in effect, that he used the terms "ought,"

"should," and "must" interchangeably, and therefore, where he

said that something should not be done, he meant it must not

be done. When reviewing jury instructions, we gauge each

instruction in the context of the entire charge. United

States v. Boylan, 898 F.2d 230 (1st Cir.), cert. denied,

U.S. , 111 S. Ct. 139 (1990). Again, having read the

entire charge, we are satisfied that the judge's supplemental

caution to the jury cleared up any misunderstanding.

-18-
18

Finally, we have considered appellant's claim of

erroneous admission of "bad act" evidence, and find it to be

without merit.

IV.

Conclusion

Appellant's conviction is affirmed.
affirmed

-19-
19