<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 98-1545

                         UNITED STATES,

                           Appellee,

                               v.

                         SUSAN JOYNER,

                     Defendant, Appellant.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF NEW HAMPSHIRE

      [Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

                  Hill, Senior Circuit Judge,

                   and Boudin, Circuit Judge.

                     _____________________

   Paul J. Garrity, by appointment of the Court, for appellant.
   Jean B. Weld, Assistant United States Attorney, with whom
Paul M. Gagnon, United States Attorney, was on brief, for appellee.

                      ____________________

                      September 8, 1999
                      ____________________

         TORRUELLA, Chief Judge.  Susan Joyner ("Joyner") appeals
from her conviction on one count of conspiracy to possess and
distribute cocaine in violation of 21 U.S.C.  846.  She argues
that in closing arguments, over her contemporaneous objection, the
government propounded facts not in evidence concerning a green
knapsack and the search of a co-conspirator's house.  Joyner also
alleges that the government, without her contemporaneous objection,
vouched for the credibility of co-conspirators and placed in issue
the government's credibility.  The government agrees that the
prosecutor erred, but moved for summary disposition.  While finding
the prosecutor's conduct during closing arguments unfortunate, we
affirm Joyner's conviction for the reasons stated below.
                           BACKGROUND
         The government offered evidence from which the jury could
reasonably have found the following facts.  Since at least 1989, a
cocaine distribution ring was operated by Josian Bez, a fugitive
defendant in this case, in Lawrence, Massachusetts. In January
1993, Jos Raphael Snchez, also a fugitive defendant, became part
of the enterprise.  Several of Joyner's co-defendants, Kelly
Charest and Haven Layne, and unindicted co-conspirator Bryan Blake
purchased cocaine from Bez and Snchez.
         In May 1994, the New Hampshire Drug Task Force ("NHDTF")
began investigating reported cocaine trafficking activities by
co-defendant Barbara Oliver in the Seacoast region of New
Hampshire.  Oliver, who lived in Dover, NH, and co-defendant Pamela
Harris regularly purchased one ounce quantities of cocaine from a
source in Dover for several months in late 1993 and early 1994. In
February 1994, an arrest brought an end to this supply.  Oliver
began dating co-defendant Bryan Blake.  Following his arrest in
June 1994, Blake introduced Oliver to his Massachusetts sources,
after which Oliver traveled to Lawrence two to three times weekly
to obtain cocaine. Snchez and Bez employed Juan Bautista
Bonifacio as a courier to meet Oliver with the cocaine.  In
September 1994, a confidential informant told the NHDTF that Pamela
Harris was involved with Oliver, and that it had purchased cocaine
from both Oliver and Harris.
         In January 1995, law enforcement officials received
community complaints from residents of the Dover Housing Authority
of numerous people coming and going, with probable drug activity,
at 3 Hampshire Circle (Oliver's residence) and 399 Washington
Street (Harris's residence).   On January 5, 1995, a search warrant
was executed at 399 Washington Street, Dover, with 5.88 grams of
cocaine seized.  Harris was arrested and convicted in Strafford
County Superior Court.  However, she continued to make trips to
Lawrence with Oliver to purchase four to six ounces of cocaine per
week.  In April 1995, Oliver moved to 6 Linda Avenue, Dover, and
met the appellant, Susan Joyner, who began accompanying Oliver or
Harris to pick up cocaine at least two times per week.
         In February 1996, Drug Enforcement Administration ("DEA")
agents interviewed another confidential informant, who stated that
Oliver was still buying cocaine from Dominicans in Lawrence. In
April 1996, another confidential source indicated that Oliver was
supplying cocaine to the bartenders at My Brother's Place in
Somersworth, which she managed.  During April and May 1996, this
informant made several controlled cocaine "buys" at My Brother's
Place and from Oliver at her new residence at 7 Ham Street, Dover.  
         Oliver paid Harris and Joyner with either an ounce of
cocaine at cost ($550), or credit to their drug debts for picking
up the cocaine.  Between October 1996, and February 1997, Joyner
and Harris purchased ten to fourteen ounces of cocaine weekly for
Oliver.  Beginning in late December, Karen Burton, who is Joyner's
sister, began to travel with Joyner, picking up ten to twenty
ounces per week throughout the spring of 1997.  Oliver called the
Lawrence source and placed the drug order.  She then informed
Joyner or Burton of the location where they would make the pickup.  
Oliver also instructed Joyner or Burton where to meet her
beforehand to receive the drug purchase money.  The two sisters,
Joyner and Burton, drove in Joyner's vehicle, a white convertible,
to Lawrence to pick up the cocaine.  The drugs were stored
temporarily at Joyner's or Harris's residence, or at a local hotel,
and then picked up by Oliver.
         On April 9, 1997, unindicted co-conspirator Brenda
Brault, who was housesitting for Barbara Oliver while she visited
her son in Pennsylvania, paged Pamela Harris.  Brault told Harris
that Oliver wanted her to call Massachusetts to arrange for a
cocaine pickup.  Harris arranged the pickup, collected the purchase
money from Brault and provided it to Joyner, who traveled with
Burton to Massachusetts.  They purchased nineteen or twenty ounces
of cocaine.  Later that same day, Oliver phoned Harris and asked
her to pick up the cocaine from Joyner and Burton.  Harris placed
the newly purchased cocaine in a toolbox which belonged to Barbara
Oliver, and which already contained approximately two ounces of
cocaine.  The toolbox was stored in a closet in Harris's bedroom.
         The next day, law enforcement officials obtained a search
warrant for Harris's apartment and seized approximately 580 grams
of cocaine, $780 in U.S. currency, a safe-deposit box key, an Ohaus
triple beam scale, a Tanita digital scale, and a bottle of
inositol.  Harris agreed to cooperate by placing a call to Oliver,
who had returned that day from Pennsylvania.  During the call,
Harris, under the supervision of law enforcement officials, used
the ruse that her probation officers were coming to visit and she
needed to have "the box" picked up right away.  Daniel Nolin,
Oliver's boyfriend, arrived at Harris's apartment and told the
officers, who posed as Harris's probation officers, that he wanted
to retrieve his toolbox.  When the officers refused to hand over
the toolbox, Nolin left.
         Later the same day, Harris placed another recorded call
to Oliver, who speculated that Harris's probation officers may have
come because Harris had been to "Sue's" (Joyner's) house or
"Karen's" (Burton's) house the previous day.  Oliver told Harris to
destroy the cocaine and throw the scales away, since she was
concerned the probation officers would return with a search
warrant.  Harris also placed a recorded call to Burton, who said
that she too had "cleaned" her apartment.  Harris related to
officers that Oliver often asked her to store the cocaine at her
residence since both Joyner and Burton were heavy cocaine addicts.  
Oliver was arrested in the evening of April 10, 1997, and during a
search of her house, officers found a drug ledger which included a
reference to "Sue & Karen - 1 1/2 back."  Based upon the evidence
elicited, Joyner was assessed with responsibility for distributing
a total of 5.1 kilograms of cocaine during the course of the
conspiracy.
         Seven co-conspirators of Joyner's testified at her trial.
Pamela Harris identified Joyner, whom she knew as "Sue," as one of
Barbara Oliver's regular drug runners, along with her sister Karen
Burton.  According to Harris, the day prior to Oliver's arrest on
April 10, 1997, Oliver paged her and requested that she collect
some cocaine which Joyner and Burton had purchased earlier in the
day. Brenda Brault, who also testified at Joyner's trial, and
Harris both stated that, during the morning of the same day
(April 9, 1997), Oliver arranged for Brault to bring Harris a bag
containing $10,000 in U.S. currency, which Harris then delivered to
Sue Joyner on the street in her home town of Rollinsford, New
Hampshire.  The bag which contained the $10,000 was a green
knapsack that belonged to one of Brault's children.  Brault had
collected the $10,000 from prior sales of fifteen to twenty ounces
of cocaine.
         Harris further testified that, at Brault's request, she
placed a call to the drug source in Massachusetts, whose number she
had previously received from Oliver.  The source wanted the usual
runners, Joyner and Burton, to come that morning for the purchase.
Later that day, Harris picked up the cocaine from Burton's house.  
Oliver had called Harris and asked her to collect the cocaine from
Joyner; however, when Harris called "Sue," she told her that Karen
had the drugs because Joyner's husband was at home.  Harris then
retrieved the nineteen ounces of cocaine, contained in a blue
Walmart bag, from Burton and brought it to her own residence, where
she stored it in Barbara Oliver's toolbox, which was in her closet.
         Harris also described the various monitored and taped
telephone conversations she had with Karen Burton and Barbara
Oliver on April 10, 1997, once law enforcement officials executed
the search warrant at her residence.  Oliver speculated as to why
Harris's probation officers (part of the cooperation ruse) may have
visited her, saying that it may have been because she went to Sue's
or Karen's house the day before. Harris said that Oliver was
referring to Sue Joyner and Karen Burton.  Harris also confirmed
that she had dealt cocaine with Barbara Oliver since 1993, often
traveling with her to pick up the drugs.  After Harris was arrested
in January 1995, she stopped the cocaine business for a short time.  
However, she eventually went back to transporting cocaine for
Oliver.  Susan Joyner became a courier along with her.  
Subsequently, Joyner and Karen Burton became the primary runners.
On many occasions from 1995 through 1997, Harris was at Oliver's
house when Joyner stopped by for the money to purchase cocaine in
Massachusetts.  Harris identified photographs of Joyner's vehicle
(a white convertible), which was used for the Massachusetts trips,
and Joyner's residence, where Harris stopped by "seven or eight"
times to pick up cocaine for Oliver.
         Brault also identified Joyner as someone she knew to have
been a regular drug runner for Barbara Oliver.  Oliver told Brault
that she would often collect the cocaine from Joyner's house.  
Before traveling to Pennsylvania, Oliver dropped off fifteen to
twenty ounces of cocaine for Brault to sell while she was out of
town.  She also told Brault that she was having Burton and Joyner
drive to Massachusetts to pick up another twenty ounce purchase for
$10,000 while she was gone.  Brault spoke with Joyner directly on
the telephone on April 9, 1997, to discuss the plans -- that Harris
would bring the money to "Sue's" house, that she would drive down
for the purchase, and that they "would hook up after, when they
came back."  She also spoke with Joyner after the purchase was
made. Brault observed Joyner stop by Oliver's house three or four
times to drop off cocaine which she had just picked up.
         Another convicted co-defendant, Kelly Charest, identified
Joyner in court as a runner for Barbara Oliver.  Charest observed
Joyner at Oliver's house twice in April 1997, picking up money in
order to make drug runs to Massachusetts. Christine Holland, an
unindicted co-conspirator, testified that she accompanied Oliver to
Joyner's house to pick up cocaine several times.  Holland and
several others she knew purchased cocaine from Joyner directly on
several occasions.
         Daniel Nolin, Oliver's boyfriend who was also a convicted
co-conspirator, identified Joyner as being involved in the cocaine
conspiracy.   He also described having seen Joyner cutting cocaine
with Oliver.  Nolin also brought a package of cash on one occasion,
at Oliver's request, to Joyner at her place of employment, the
Walmart hair salon in Somersworth, New Hampshire.  Nolin also
identified Joyner's residence, stating that he had picked up
half-pound quantities of cocaine there for Oliver.
         Barbara Oliver testified as to the breadth and membership
of the cocaine operation she had run for several years.  According
to Oliver, during the two years Joyner worked for her, she acted as
her drug courier more steadily than any runner she had employed.
Joyner was selling an ounce at a time to her own customers.  Oliver
allowed her simply to buy her own ounce at cost in return for
making the drug trips.  She described the general mode of operation
utilized by Joyner and her sister, Karen Burton, to make the drug
runs.  Generally, Joyner would leave the cocaine for Oliver to pick
up from either her car or her house.  Oliver also described the
events of April 9, 1997, in a similar fashion to the testimony
given by Harris and Brault.
         Finally, Juan Bautista Bonifacio, one of the sources of
supply in Lawrence, identified Joyner as the person who regularly
picked up cocaine from him in April 1997, right before he was
arrested.  Bonifacio testified that Joyner came at least once a
week, along with another thin, blond woman, like herself.  Joyner
had also traveled with "Barbara" to get the drugs on many
occasions.
         Detective Sergeant Steven Demo, with the NHDTF, testified
to having recovered, during the search of Harris's home on
April 10, 1997, a piece of paper containing phone numbers, which
was discovered inside the false bottom of a book.  Contained on the
sheet was the phone number of the hotel at which Barbara Oliver was
staying in Pennsylvania, and phone numbers linked to Karen Burton
and Susan Joyner.  Demo also testified to discovering one call from
Susan Joyner to Barbara Oliver's caller ID on April 10, 1997.  Demo
also confirmed that the child's knapsack which Brault gave to
Harris with the money, and which Harris gave to Joyner, was found
in Harris's bedroom closet during the search, where the toolbox was
located.
         In her summation, the prosecutor noted all the ways in
which the co-conspirators' accounts of their dealings with Susan
Joyner corroborated each other.  Particularly, she described the
points on which Brault, Harris, Charest, Oliver, Nolin and
Bonifacio were on all fours with regard to the events which
occurred on April 9, 1997.  The prosecutor also recounted the items
of independently corroborating physical evidence, including the
drug ledger, personal phone book and phone number list seized from
Harris, the various telephone calls from Oliver and calls to the
sources of supply, calls to beepers, and the taped telephone
conversations which Harris made to Oliver and Burton.
         During his closing, defense counsel attempted to show
that each of the co-conspirator witnesses had lied.  Specifically,
he attempted to demonstrate that Harris lied, and that she was
actually the person who traveled to Massachusetts to purchase the
cocaine found in her closet on April 10, by arguing that her
testimony that she gave the child's knapsack full of money to
Joyner for the drugs was belied by the fact that police found the
knapsack in her own closet the next day. He also argued that
because Sergeant Demo's report had not initially listed Joyner's
phone number on the scrap of paper he retrieved from Harris's
residence, that Harris or someone must have doctored the paper by
later adding Joyner's first name and telephone number.
         In rebuttal, the prosecutor responded to defense
counsel's assertion that someone, perhaps someone in law
enforcement, had doctored the paper with phone numbers by calling
such an allegation "absurd."  She argued:
                   What, do you think that we had Pam Harris --
         oh no, we don't have enough evidence against
         Susan Joyner.  Hey, Pam -- wink, wink nod, nod
         -- write her number down here?  That's absurd.  
         This piece of evidence was seized from Pam
         Harris' residence.  The numbers appeared on
         it, the numbers stayed on it.  No number was
         added.
In response to the allegation that all the witnesses were lying,
the prosecutor stated:
                   I don't want to keep flipping through these
         pages and showing you this.  She [Barbara
         Oliver] didn't want to insulate herself.  She
         is dead in the water.  These are her telephone
         toll records.  Look at them.  Barbara Oliver
         told the truth.  Everyone told the truth in
         this case, ladies and gentlemen.
         Finally, the prosecutor responded to the allegation that
the discovery of the child's knapsack in Harris's closet proved
that she lied about the events of April 9, 1997, as follows:
                   She [Harris] gives Sue the money, Sue brings
         the money down to Lawrence, the drugs are put
         in this bag and brought back. [Objection
         interposed, district court instructs jurors
         their recollection should prevail.] What Pam
         Harris testified to, and it is only your
         recollection of the evidence, only, what Pam
         Harris testified to was that the cocaine she
         received back from Karen Burton came in this
         bag.  And if you don't recollect that -- [Same
         objection. The court again instructs jurors
         that their recollection prevails.]
         The jury found Joyner guilty on one count of conspiracy
to possess and distribute cocaine in violation of 21 U.S.C.  846.  
The district court sentenced her to ninety-seven months
imprisonment and five years supervised release.
         Joyner filed a post-trial motion to set aside the verdict
based upon the ground raised in this appeal, an improper closing
argument by the prosecutor, and the motion was summarily denied.
                           DISCUSSION
I.  Improper Evidentiary Argument
         Joyner argues that the prosecutor, by asserting that the
green knapsack was found in Harris's residence because Burton had
given the cocaine to Harris in that knapsack, asserted facts that,
according to all the evidence, were simply not true.  Joyner
contends that the prosecutor's conduct is "all the more egregious
because, when questioning Harris, she had explicitly referred to
the cocaine being in a blue Wal-Mart plastic bag, not in a child
knapsack."  Appellant's Br. at 18.
         Because counsel timely objected to this line of argument,
we review for harmless error, that is, whether the argument was
"sufficiently prejudicial to warrant a new trial under the
circumstances."  United States v. Rosales, 19 F.3d 763, 767 (1st
Cir. 1997).  In determining whether the prosecutor's remarks were
harmless, we consider
                   a range of factors starting with the nature of
         the (mis)conduct and ending with the
         unavoidable bottom line: whether we deem it
         likely, or not, that any prejudice affected
         the outcome of the case.  In conducting this
         analysis, we evaluate the prosecutor's
         comments as a whole, not in isolation.

Id. (quotation marks and citation omitted).
         Our analysis begins with an examination of the
prosecutor's rebuttal:
                   Prosecutor: [Attorney Garrity made a big deal
         about how Pam Harris lied.] [B]ring the money
         to [Joyner] in this knapsack, because it was
         found in her closet at her house.  She gives
         [Joyner] the money, [Joyner] brings the money
         down to Lawrence, the drugs are put in this
         bag and brought back.

                   Appellant: There's no evidence of that.

                   Court: Members of the jury, you will take your
         own  recollection of the evidence and not what
         either counsel has told you the evidence is.

                   Prosecutor: What Pam Harris testified to, and
         it is only your recollection of the evidence,
         only, what Pam Harris testified to was that
         the cocaine she received back from Karen
         Burton came in this bag. And if you don't
         recollect that   

                   Appellant: There's no evidence of that, your
         Honor.

                   Prosecutor: It is your recollection.

                   Court: Members of the jury, it's your
         recollection once again that will control, not
         what counsel says.  So don't repeat the
         statement. It's not a contest.

         After closing arguments, the court instructed the jury
that arguments of counsel were not evidence, the jury's
recollection of the evidence controlled and any statement of
counsel conflicting with its recollection should be ignored.
         A review of Harris's testimony confirms that the
prosecutor, in arguing "what Pam Harris testified to was that the
cocaine she received back from Karen Burton came in [the green
knapsack]," misstated the trial testimony.  Harris actually
testified that the cocaine was returned to her in a blue plastic
Walmart bag. While this remark misstated Harris's testimony,
Joyner's contention notwithstanding, there is no indication that
the remark was a knowing misrepresentation of the evidence.  Such
a negligent misrecollection, while still inappropriate, is less
serious than intentionally arguing facts not in evidence.
         This Court has fashioned a three prong test for examining
whether the prosecution's misconduct "so poisoned the well" that
the trial's outcome was likely affected, thus warranting a new
trial.  See United States v. Capone, 683 F.2d 582, 586-87 (1st Cir.
1982).  We examine: (1) whether the prosecutor's conduct was
isolated and/or deliberate;  (2) whether the trial court gave a
strong and explicit cautionary instruction; and (3) whether it is
likely that any prejudice surviving the judge's instruction could
have affected the outcome of the case.  See United States v. Hodge-
Balwig, 952 F.2d 607, 610 (1st Cir. 1991).
         First, the prosecutor's comments regarding the child's
green knapsack were isolated, and occurred only twice during her
rebuttal.  Contrary to Joyner's allegation, the misstatement does
not appear to be a deliberate misrecollection.  Second, the
district court quickly and adequately addressed the situation with
cautionary instructions during the prosecutor's rebuttal, and told
government counsel to move on.  The jurors were left with a
situation in which government counsel said that Harris testified a
certain way, and defense counsel's clear assertion that she did
not.  After closing arguments, the court instructed the jury: (1)  
that arguments of counsel were not evidence; (2) that the jury's
recollection of the evidence controlled; and (3) that any statement
of counsel conflicting with its recollection should be ignored.  
Finally, the overwhelming evidence of Joyner's guilt, including
testimony by seven co-conspirators, which was corroborated by
documentary evidence, eliminates any lingering doubt that the
remarks could have unfairly prejudiced the jury's deliberations.
         Returning to the "unavoidable bottom line" test of
Rosales -- whether we deem it likely, or not, that any prejudice
affected the outcome of the case -- we conclude that the errors did
not affect the trial's outcome.  The prosecutor's errors are minor
given the testimonial evidence.  The unexplained presence of the
knapsack at Harris's residence was not particularly probative.  The
jury was quite likely to infer that the blue Walmart bag was
returned to Harris in the green knapsack without the government's
erroneous rebuttal remarks. Joyner has not shown anywhere near
enough evidence to prove that the argument was sufficiently
prejudicial to warrant a new trial under the circumstances.
II.  Vouching
         Joyner also argues that the prosecutor disregarded the
well established rule against vouching in both summation and
rebuttal by repeatedly assuring the jury that government witnesses
were truthful and placing the credibility of her position at issue.  
Because counsel failed to make a contemporaneous objection, we
review for "plain error."  See United States v. Roberts, 119 F.3d
1006, 1014 (1st Cir. 1997).  Joyner faces a high hurdle in this
regard, because our review under the plain error standard is
ordinarily limited to "blockbusters" and does not consider "the
ordinary backfires -- whether or not harmful to a litigant's cause
-- which may mar a trial record."  Id.  In order to prevail, Joyner
must demonstrate that the error is plain, and undermines the
fundamental fairness of the trial.  See id.
         With that said, there is no denying that the prosecutor
stepped over the proverbial line with her statements.  When a
prosecutor places the credibility of counsel at issue, the
advantage lies solidly with the government, and thus, prosecutors
are prohibited from doing so.  See United States v. Cresta, 825
F.2d 538, 555 (1st Cir. 1987); see also United States v. Nickens,
955 F.2d 112, 121 (1st Cir. 1992); United States v.
Rodrguez-Estrada, 877 F.2d 153, 158 (1st Cir. 1989) (same).  Even
the government admits that the prosecutor acted inappropriately.
         In its brief, the government concedes that: (1) comments
during the prosecutor's summation -- that the witnesses were
telling the truth -- were improper; (2) the prosecutor's statements
that the government does not just "round up as many people as we
possibly can to point the finger at Susan Joyner and just run in
here and expect you to buy it" could also have been more artfully
presented; (3) the prosecutor's comments about witnesses telling
the truth in rebuttal "again inartfully stepped over the witness-
vouching line"; and (4) the interjection of her personal life and
the government's efforts into the trial were improper.  While some
of her remarks came at the provocation of defense counsel, and thus
while still inexcusable are understandable, others did not.  There
should be no need to remind federal prosecutors that they are not
free to disregard the bounds of proper argument even in response to
perceived provocation.  See United States v. Young, 470 U.S. 1,
18-19 (1985).
         Under the "plain error" standard, Joyner bears the burden
of showing that the prosecutor's remarks resulted in prejudice,
i.e., affected her substantial rights.  See United States v. Olano,
507 U.S. 725, 732-34 (1993).  Even then, however, we will not
notice error unless it caused "a miscarriage of justice" or
seriously undermined "the integrity or public reputation of
judicial proceedings." Id.  We must consider the likely impact the
prosecutor's remarks had on the jury in light of the entire record,
including the closing argument presented by the defense.  See
Young, 470 U.S. at 16-17.
         Given that Joyner's counsel accused either the government
or a government witness of altering a piece of physical evidence,
and challenged the investigator's decision not to have Pamela
Harris place a monitored phone call to Susan Joyner, as well as
Oliver and Burton, the prosecutor's rebuttal was understandable,
albeit still inappropriate.  See United States v. Oreto, 37 F.3d
739, 746 (1st Cir. 1994) (tolerating measured response to repeated
attempts to magnify government misconduct).  Given the overwhelming
evidence against Joyner, see supra, and the provocative excesses in
the closing argument presented by her own counsel, as well as the
timely jury instructions by the district court, the improper
remarks by the prosecutor in her closing arguments did not rise to
the level of plain error.
                           CONCLUSION
         For the reasons stated above, we affirm.

</body>

</html>